## WHITE v BEASLEY

Docket No. 101350. Argued January 10, 1996 (Calendar No. 5). Decided August 1, 1996. Rehearing denied *post*, 1205.

Sheila White, as personal representative of the estate of Phoebe Obleton, deceased, brought an action in the Wayne Circuit Court against Detroit Police Officer Keith D. Beasley, alleging that the defendant was grossly negligent in responding to a telephone request for aid for the decedent. The court, Kaye Tertzag, J., denied the defendant's motion for summary disposition. The Court of Appeals, SAWYER, P.J., and T. G. KAVANAGH and L. L. HEATHSCOTT, JJ., affirmed, finding that the defendant's arrival at the crime scene was sufficient to satisfy the special-relationship exception to the public-duty doctrine (Docket No. 144445). The defendant appeals.

In an opinion by Chief Justice BRICKLEY, joined by Justices RILEY and WEAVER, and an opinion by Justice BOYLE, the Supreme Court *held*:

The public-duty doctrine remains valid in Michigan. As applied to police officers, the doctrine insulates them from tort liability for the negligent failure to provide police protection unless the plaintiff satisfies the special-relationship exception to the doctrine. In determining, in cases of nonfeasance, whether a special relationship existed between an officer and a plaintiff, a court should consider if there was an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; knowledge on the part of the municipality's agent that inaction could lead to harm; some form of direct contact between the municipality's agents and the injured party; and that party's justifiable reliance on the municipality's affirmative undertaking.

1. The public-duty doctrine protects governments from unreasonable interference with policy decisions. Tort liability should not be based on statutes and ordinances that are not traditionally relied on to impose liability or do not themselves specifically expose government employees to liability. While the inequitable and harsh results created by the doctrine are a significant concern when the doctrine is applied to most government employees, the dangerous work environment inherent in police activities is a counterbalancing concern when the doctrine is applied to police

officers. Statutes and ordinances not specifically exposing government employees to liability should not be the basis for finding that a government employee owes a plaintiff a duty in tort. A government employee's job title, such as police officer, alone does not create a duty between the employee and specific members of the public, and the public-duty doctrine shields a government employee from liability that is based solely on the employee's particular job title.

2. The special-relationship exception to the public-duty doctrine exposes a government employee to liability for actions committed when there is a special relationship between the employee and the plaintiff. In determining whether, as applied to police officers, a special relationship existed between an officer and a plaintiff, a court should consider if there was an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; knowledge on the part of the municipality's agent that inaction could lead to harm; some form of direct contact between the municipality's agents and the injured party; and that party's justifiable reliance on the municipality's affirmative undertaking. Because police officers are employed to work in a milieu of criminal activity where every decision is fraught with uncertainty, and because of the unusual and extraordinary nature of police work it is unfair to allow a jury of laymen with the benefit of 20/20 hindsight to second guess the exercise of a police officer's discretionary professional duty. The special-relationship test responds to these concerns by insulating police officers from liability arising from tortious conduct on the job in almost all instances. It also provides plaintiffs some relief in the particularly egregious cases where an officer promises police protection, but negligently carries out that promise.

3. While the Supreme Court is free to abandon the public-duty doctrine, it is not compelled to do so. The public-duty doctrine is a part of the law of the state, and, in recent years, has been relied on consistently by the Court of Appeals. That the Supreme Court has not chosen to recognize the doctrine is insufficient to ignore Court of Appeals precedent. It simply leaves open the question whether the doctrine should be adopted; it does not prevent adoption. What is not a part of the law of this state is the recognition of any duty in tort on the part of the police greater than would be faced by any other member of society with similar training, knowledge, and skill.

4. The public-duty doctrine is not a doctrine of governmental immunity. It is a doctrine of tort law that determines whether a duty in tort exists, not whether an individual is immune from an otherwise existing tort duty. Accordingly, it is consistent with 1986

PA 175, MCL 691.1407(2); MSA 3.996(107)(2), and neither *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567 (1984), nor 1986 PA 175 compels the Supreme Court to abandon the doctrine.

5. Summary disposition is appropriate in this case. The public-duty doctrine shields the officer from liability for the charged conduct. The facts do not establish a special relationship between the officer and the decedent. Applying the special-relationship test, the plaintiff failed to allege at least two of the elements necessary to establish a special relationship: she did not allege facts sufficient to suggest that there was direct contact between the police officer and the decedent, and she failed to suggest that the decedent justifiably relied on any affirmative action taken by the police department. As a result the plaintiff has failed to state a claim on which relief can be granted.

Justice BOYLE, concurring, additionally stated that the facts of this case do not require resolution of whether the public-duty doctrine should be applied to insulate government agents who have assumed a duty and whose affirmative misconduct causes harm. Clearly, the plaintiff is not alleging that defendant Beasley's affirmative actions caused the harm, but, rather, asserts that the defendant's inaction, the failure to render assistance, led to the harm. For a person to be liable for nonfeasance, there must be a special relationship that imposes a duty to protect another. The special-relationship test, by its own terms, can be applied only in an instance where an officer failed to carry out a promise or an assumed duty to act. This case does not involve active misfeasance. At most, defendant Beasley's passive inaction could be said to be inconsistent with his duty to prevent crime or to provide police protection.

Justice CAVANAGH, joined by Justice MALLETT, concurring in part and dissenting in part, stated that the special-relationship test should flow from the fundamental tort principle that a duty is owed to foreseeable plaintiffs, and application should be limited to cases in which an officer fails to protect a person from the actions of a third party, not where injury is caused by the officer's actions. Where a crime was already in progress at the time the police were contacted, there should be proof that the plaintiff was an identifiable foreseeable victim of the crime by establishing that the officer actually arrived on the scene, that the officer knew or should have known that an identifiable crime was in progress and that the plaintiff was or would be an identifiable victim, that the officer should have reasonably foreseen that the victim would suffer further bodily harm if the officer did not intervene, that the officer had the resources available on the scene to render assistance, and that the officer's intervention could have changed the outcome.

The first question in any negligence action involves duty. Duty exists because the relationship between the parties gives rise to a legal obligation. The public-duty doctrine begins with the premise that police officers owe a duty to the public to investigate crime and to protect the citizenry because they are police officers. Further, it recognizes that police officers and their departments must make discretionary or policy decisions in order to carry out the duties imposed on them. The legal tort system is ill-equipped to second-guess a discretionary decision to prioritize calls in order of perceived need and availability of officers to respond. Evaluations of the propriety of decisions such as budgetary items, training, equipment, procedures, and response techniques, are best left to the other branches of government. Accordingly, the public-duty doctrine precludes basing tort liability solely on the obligations owed by police officers to the public at large.

Nevertheless the special-relationship exception to the public-duty doctrine is based on the recognition that there are situations in which discretionary or policy decisions are no longer at issue because the decision to assist a particular person has already been made. The issue then becomes whether the police officer's connection to a particular person has created an actionable special and identifiable obligation to render assistance to that person. When the connection is strong enough so that a relationship between the police officer and the victim arises that is distinct from the relationship between the police officer and the public at large, the courts will impose a special duty. In order to establish the contact element of the special-relationship exception, it must be shown that the plaintiff or someone on the plaintiff's behalf, contacted the police.

In this case, the plaintiff has alleged that the police officer arrived at the scene and was informed that the victim had been attacked and that, as a result of the officer's failure to perform his duties, she died. Sufficient facts were pleaded to establish that the officer owed a special duty to the victim to survive the motion for summary disposition.

Reversed and remanded.

Justice LEVIN, dissenting, stated that in this case, the Supreme Court adopts the public-duty doctrine without consideration of prior Michigan case law, indicating that the public-duty doctrine is not part of the law of this state, and without consideration of 1986 PA 175, which amended § 7 of the governmental tort liability act in a manner that is inconsistent with recognition of a public-duty doctrine. It appears that the public-duty doctrine is being incorporated into the jurisprudence because of the dangerous working conditions facing police officers, a consideration not applicable to governmental employment generally. The immunity from tort liability created in this case by judicial opinion for police officers applies

only for acts of nonfeasance, such as a failure to rescue, but the implications for the jurisprudence in appearing to adopt the public-duty doctrine may have far-reaching ramifications.

1986 PA 175 wholly occupied the field of governmental immunity, supplanting both *Ross*, and the Supreme Court's decisions after July 1, 1965. The public-duty doctrine did not exist in 1965 in Michigan, and the Supreme Court is not free to disregard the Legislature's intent by engrafting it onto governmental immunity law. There is no requirement in subsection 7(1) that the Supreme Court adopt all mechanisms that shield the state from liability.

Before the 1986 amendments, *Ross* established the liability of lower level governmental employees by providing immunity for all acts that were discretionary-decisional, while providing for liability when a ministerial-operational function was performed negligently. The 1986 legislation changed the law of immunity by increasing the immunity of lower level employees for ministerial acts, allowing liability only when the conduct constituted gross negligence, rather than simple negligence. At the same time, however, the act decreased immunity by allowing liability to attach for grossly negligent discretionary-decisional actions, actions which had previously been completely immune from liability. This is the only reading of 1986 PA 175 that gives full effect to the abolition of the ministerial/discretionary distinction and the establishment of gross negligence as the standard of care.

206 Mich App 459; 522 NW2d 681 (1994) reversed.

*Lopatin, Miller, Freedman, Bluestone, Herskovic & Heilmann* (by *Richard E. Shaw*) for the plaintiff.

*City of Detroit Law Department* (by *Phyllis A. James,* Corporation Counsel, and *Sharon D. Blackmon,* Assistant Corporation Counsel) for defendant Beasley.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Michael C. McDaniel,* Assistant Attorney General, for the Attorney General, Tort Defense Division.

*O'Connor, DeGrazia & Tamm, P.C.* (by *Julie McCann-O'Connor* and *James I. DeGrazia*), for Michigan Municipal League and Michigan Municipal Liability and Property Pool.

*Mark Granzotto* and *Jeffrey T. Meyers* for Michigan Trial Lawyers Association.

BRICKLEY, C.J. This case requires that we decide if the public-duty doctrine should still be recognized in Michigan and, if it should, to define the limits of the special-relationship exception to that doctrine as applied to police officers. We conclude that the public-duty doctrine remains valid in Michigan. We also conclude that the most appropriate special-relationship test for examining the relationship between police officers and private individuals is the test articulated by the New York Court of Appeals in *Cuffy v City of New York*, 69 NY2d 255; 513 NYS2d 372; 505 NE2d 937 (1987).

I

FACTS

This case comes to us to consider defendant's motion for summary disposition alleging a failure "to state a claim on which relief can be granted." MCR 2.116(C)(8). Therefore, for purposes of deciding if the lower courts correctly ruled on the motion, we accept all well-pleaded facts in plaintiff's complaint as true. *Wade v Dep't of Corrections*, 439 Mich 158, 162-163; 483 NW2d 26 (1992).

Plaintiff alleges that defendant, Detroit Police Officer Keith D. Beasley, was grossly negligent when he responded to a telephone call requesting aid on behalf of decedent, Phoebe Obleton. At 12:30 A.M., on

Tuesday, October 9, 1990, through the decedent's bathroom window, her neighbors saw her husband attack her. They also heard the decedent screaming for help. Responding to the situation, two of the neighbors telephoned Detroit's 911 emergency dispatch service requesting emergency assistance on behalf of decedent. Further calls to 911 followed. Finally, at 12:40 A.M., neighbors placed a direct call to the local police station.

At 1:30 A.M., Officer Beasley and another police officer arrived at the decedent's residence.[1] Decedent's neighbors met the officers, explained that they had seen the decedent's husband attacking her, communicated that they heard her scream for help, and informed the officers of her apartment number. The complaint alleges that, in response, the officers, "after taking down the witnesses' names, simply circled the building and left without ever attempting to knock on Plaintiff decedent's apartment door, or make any attempt to contact Plaintiff decedent or determine if, in fact, she was being or had been attacked."

At 4:15 A.M., the decedent's husband telephoned Detroit's 911 service to report that he had stabbed his wife to death. At 4:50 A.M., three hours and twenty minutes after Officer Beasley arrived outside the decedent's residence, she died.

Sheila White, as personal representative of the decedent's estate, filed a suit against the City of Detroit, the City of Detroit Police Department, the 911 operator, and both responding police officers. The trial court dismissed the claims against the city

---

[1] The other officer is named in plaintiff's complaint but did not join defendant's motion for summary disposition. Therefore, any claims regarding the other officer are not before this Court.

and the police department on the basis of governmental immunity. The 911 operator and defendant Officer Beasley moved for summary disposition for failure "to state a claim on which relief can be granted." MCR 2.116(C)(8). Defendants relied exclusively on the public-duty doctrine, arguing that they owed a duty to the public only, not to the decedent as an individual. The trial court denied their motion.

The Court of Appeals reversed with respect to the 911 operator.[2] 206 Mich App 459, 462; 522 NW2d 681 (1994). It reasoned that the public-duty doctrine applied to the 911 operator and that the relationship between the decedent and the 911 operator was too attenuated to satisfy the special-relationship exception to the public-duty doctrine. *Id.* However, it upheld the trial court's denial of summary disposition for Officer Beasley. *Id.* at 466. It found that defendant's arrival at the crime scene was sufficient to satisfy the special-relationship exception to the public-duty doctrine. *Id.* at 462. Defendant appealed to this Court.

Defendant's appeal places two issues squarely before this Court. First, because we have not yet addressed the issue, we must decide if the public-duty doctrine is viable in Michigan. Second, provided that we accept the existence of the public-duty doctrine, we must also define the limits of the doctrine's special-relationship exception when applied to police officers.[3]

---

[2] The 911 operator is not a party to this appeal and plaintiff has not filed a cross appeal.

[3] In this case we do not decide whether the same test, or a separate test, should be applied to other government employees.

II

THE PUBLIC-DUTY DOCTRINE

We hold that the public-duty doctrine applies in Michigan. As defined by Justice COOLEY, the public-duty doctrine provides

> [t]hat if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. [2 Cooley, Torts (4th ed), § 300, pp 385-386.]

Applied to police officers, the public-duty doctrine insulates officers from tort liability for the negligent failure to provide police protection unless an individual plaintiff satisfies the special-relationship exception. See *Cuffy*, 69 NY2d 260.

Currently, the public-duty doctrine is under attack because some commentators believe that the doctrine unjustifiably creates inequitable and harsh results for plaintiffs. The doctrine has an "all or nothing" character that may deny a plaintiff recovery just because the tort was committed by a public, rather than a private, employee. The problems stemming from the doctrine's "all or nothing" character are compounded by the lack of guidance in defining which duties are public and which are specific individual duties. Partly on the basis of these concerns, some courts have abandoned the public-duty doctrine altogether.[4] See, e.g.,

---

[4] Also influential to most jurisdictions abandoning the public-duty doctrine is the feeling that it is another form of sovereign immunity that is

*Ryan v State*, 134 Ariz 308, 310; 656 P2d 597 (1982), and *Leake v Cain*, 720 P2d 152, 159 (Colo, 1986). While the inequitable and harsh results created by the doctrine are a significant concern when the doctrine is applied to most government employees, we conclude that the dangerous work environment inherent in police activities is a counterbalancing concern when the doctrine is applied to police officers, as will be discussed in part III of this opinion.

Otherwise, there are two basic justifications for retaining the public-duty doctrine. First, the doctrine protects governments from unreasonable interference with policy decisions, and, second, it protects government employees from unreasonable liability.

We agree that the public-duty doctrine serves a useful purpose by protecting governments from unreasonable interference with policy decisions. As noted by the Supreme Court of Illinois, while deciding a suit alleging that the failure to enforce the City of Chicago's housing code led to a child's injury,

> If the failure of the city to enforce [an] ordinance should render it liable for injuries sustained thereby, the tremendous exposure to liability would certainly dissuade the city from enacting ordinances designed for the protection and welfare of the general public, and thereby the general public would lose the benefit of salutary legislative enactments. [*Stigler v Chicago*, 48 Ill 2d 20, 24-25; 268 NE2d 26 (1971).]

We find the reasoning of the Supreme Court of Illinois persuasive. A convincing justification for the contin-

---

inconsistent with the abrogation of governmental immunity in their jurisdictions. See, e.g., *Adams v State*, 555 P2d 235, 241-242 (Alas, 1976), *Brennen v City of Eugene*, 285 Or 409; 591 P2d 719 (1979), and *Chambers-Castanes v King Co*, 100 Wash 2d 275, 291; 669 P2d 451 (1983) (Utter, J., concurring in result).

ued recognition of the public-duty doctrine is its purpose of shielding governmental units from liability "when its employees act, or refuse to act, so as to conform to a municipal ordinance and/or a state statute." *Sawicki v Village of Ottawa Hills*, 37 Ohio St 3d 222, 226; 525 NE2d 468 (1988).

Further, tort liability should not be based on statutes and ordinances that are not traditionally relied on to impose liability or do not themselves specifically expose government employees to liability. Such liability may also deter the governmental entity from enacting protective legislation, fearing that the added cost of employee liability will eventually be borne by the governmental entity. Additionally, we note that mechanisms besides the threat of liability in negligence exist to hold employees accountable for failure to conform to statutes and ordinances. See *Ezell v Cockrell*, 902 SW2d 394, 398 (Tenn, 1995).

Similarly, we agree that the public-duty doctrine is justified to the extent that it clarifies that a government employee's job title alone does not create a duty between the employee and specific members of the public. For example, police officers should not be liable for insuring the general public's welfare just because their job title lists them as "police officers." Police officers should not be liable "for failing to protect a member of the general public from a criminal act of which they were not aware but should have anticipated and prevented . . . ." *De Long v Erie Co*, 60 NY2d 296, 304; 469 NYS2d 611; 457 NE2d 717 (1983).

Further, we agree that

[f]or the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the

particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits. [*Riss v City of New York*, 22 NY2d 579, 581-582; 240 NE2d 860 (1968).]

Therefore, we agree that the public-duty doctrine should shield a government employee from liability that is based solely on that employee's particular job title.

In conclusion, we find that the public-duty doctrine still serves several useful purposes. The government should be protected from unreasonable interference with policy decisions. Government employees should enjoy personal protection from tort liability based on their action in conformity with, or failure to conform to, statutes or ordinances not intended to create tort liability. The job titles of government employees alone should not create a duty to specific members of the public. Therefore, we adhere to the public-duty doctrine in Michigan to the extent that the doctrine achieves these objectives.

III

THE SPECIAL-RELATIONSHIP EXCEPTION

The special-relationship exception to the public-duty doctrine exposes a government employee to liability for the employee's actions whenever a court finds that the government employee has a "special-relationship" with the plaintiff. *Sawicki*, 37 Ohio St 3d 230. Whether or not the employee has a "special-relationship" with the plaintiff is determined by the specific test applicable in that state. A survey of special-relationship tests reveals deep disagreement

among the states regarding the exact nature of the "special-relationship" the plaintiff must prove.[5]

The only special-relationship test adopted in more than one state is the test adopted by the New York Court of Appeals in *Cuffy, supra* at 260. The *Cuffy* test has also been adopted in Ohio and, with modification,[6] in Georgia. *Sawicki,* 37 Ohio St 3d 232; *City of Rome v Jordan,* 263 Ga 26, 29; 426 SE2d 861 (1993). The elements of the *Cuffy* test are:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured;
>
> (2) knowledge on the part of the municipality's agent that inaction could lead to harm;
>
> (3) some form of direct contact between the municipality's agents and the injured party; and
>
> (4) that party's justifiable reliance on the municipality's affirmative undertaking . . . . [*Cuffy,* 69 NY2d 260.]

We recognize that this test is somewhat arbitrarily restrictive. On first glance the test reads more like a test for promissory estoppel under contract law than a test for a special relationship in tort. However, we

---

[5] See *Ashburn v Anne Arundel Co,* 306 Md 617, 631; 510 A2d 1078 (1986), *Bailey v Town of Forks,* 108 Wash 2d 262, 268; 737 P2d 1257 (1987), *Braswell v Braswell,* 330 NC 363, 371; 410 SE2d 897 (1991), *Coty v Washoe Co,* 108 Nev 757, 760; 839 P2d 97 (1992), *Ezell, supra,* 402; *Fessler by Fessler v REJ Inc,* 161 Ill App 3d 290, 296; 514 NE2d 515 (1987), *Hage v Stade,* 304 NW2d 283, 286 (Minn, 1981), *Melendez v Philadelphia,* 320 Pa Super 59, 65; 466 A2d 1060 (1983), *Shore v Stonington,* 187 Conn 147, 153-155; 444 A2d 1379 (1982), and *Williams v State,* 34 Cal 3d 18, 25; 192 Cal Rptr 233; 664 P2d 137 (1983).

[6] The Georgia Supreme Court eliminated the element of "direct contact" from the *Cuffy* special-relationship test. *City of Rome v Jordan,* 263 Ga 26, 29; 426 SE2d 861 (1993). The court found the element unfair and duplicative, arguing that the requirement of plaintiff's detrimental reliance on the government's promise satisfied the same concerns as the element of "direct contact."

also recognize that police officers are employed to work in a "milieu of criminal activity where every decision is fraught with uncertainty." *Ezell, supra,* 398. Because of the unusual and extraordinary nature of police work it is unfair to allow "a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's discretionary professional duty." *Shore v Stonington,* 187 Conn 147, 157; 444 A2d 1379 (1982).

The test articulated in *Cuffy* responds to these concerns by insulating police officers from liability arising from their tortious on the job conduct in almost all instances where a plaintiff alleges a failure to provide police protection. Yet, the test also provides plaintiffs some relief in the particularly egregious case of an officer promising police protection, but negligently carrying out that promise. Although this test may deny recovery to some deserving plaintiffs, we prefer to be cautious when exposing police officers to on the job liability. Police officers must work in unusual circumstances. They deserve unusual protection. Therefore, at least when applied to police officers, we would adopt the *Cuffy* special-relationship test.

IV

JUSTICE LEVIN'S DISSENT

In his dissent, Justice LEVIN argues that this Court is compelled to abandon the public-duty doctrine for two reasons: because it is not a part of the law of this state and because the doctrine is inconsistent with MCL 691.1407(2); MSA 3.996(107)(2). We conclude that the dissent overstates the argument. This Court

is free to abandon the public-duty doctrine, but not compelled to do so.

First, the public-duty doctrine is a part of the law of this state. In recent years the Court of Appeals has consistently relied on the doctrine.[7] Admittedly, before this case, this Court has not chosen to recognize the doctrine, but that is not sufficient grounds to ignore Court of Appeals precedent. This Court's previous failure to recognize the public-duty doctrine simply leaves open the question whether this Court should adopt the doctrine. It does not prevent this Court from adopting the doctrine.

On the other hand, what is not a part of the law of this state is the recognition of any duty in tort on the part of the police "under state law and the Charter of the City of Detroit to protect the public."[8] *Post* at 354. *Fiser v City of Ann Arbor*, 417 Mich 461; 339 NW2d

---

[7] See, e.g., *Gazette v Pontiac*, 212 Mich App 162; 536 NW2d 854 (1995); *Singerman v Municipal Service Bureau, Inc*, 211 Mich App 678; 536 NW2d 547 (1995); *Harrison v Corrections Dep't Dir*, 194 Mich App 446; 487 NW2d 799 (1992); *Jones v Wilcox*, 190 Mich App 564; 476 NW2d 473 (1991); *Massey v Corrections Dep't*, 182 Mich App 238; 451 NW2d 869 (1990); *Markis v Grosse Pointe Park*, 180 Mich App 545; 448 NW2d 352 (1989); *Simonds v Tibbitts*, 165 Mich App 480; 419 NW2d 5 (1987); *Hobrla v Glass*, 143 Mich App 616; 372 NW2d 630 (1985); *Rose v Mackie*, 22 Mich App 463; 177 NW2d 633 (1970).

[8] We interpret this phrase in the dissent as a recommendation for establishing an overarching tort duty to "protect the public" based in part on the interpretation of statutes never previously employed to find a tort duty. A similar argument was adopted in a dissent, but rejected by the majority of the Court of Appeals in *Zavala v Zinser*, 123 Mich App 352; 333 NW2d 278 (1983). To the extent this phrase suggests that the Court should create tort liability burdens for police officers greater than imposed by common-law tort principles, we also disagree.

However, where not supplanted by statute or common-law concepts such as the public-duty doctrine, we would recognize that police officer conduct should be judged by the same common-law tort concepts applicable to private citizens. "The officer's conduct should be compared to 'that care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances.'" *Fiser v City of*

413 (1983), relied on by the dissent, simply recognizes that, where the Legislature has provided an exception to statutory immunity, the police are subject to the same tort concepts affecting liability faced by private individuals. In this state, as in all other states that we are aware of, police are not subject to greater tort liability than would be faced by any other member of society with similar training, knowledge, and skill.

Similarly, we conclude that the dissent has confused the term "duty" as used in the former text of MCL 92.4; MSA 5.1752 with the concept of duty as an element of tort law. Aside from tort law, "duty" also means any "action or a task required by one's position or occupation." *Random House College Dictionary: Revised Edition.* It is in this sense that MCL 92.4; MSA 5.1752 enumerates the tasks and powers assigned to police officers. The Legislature' never intended MCL 92.4; MSA 5.1752 to impose a duty in tort.

Second, we disagree with Justice LEVIN's assertion that the public-duty doctrine is a doctrine of governmental immunity. Instead, we conclude that the public-duty doctrine is a doctrine of tort law. See *Sawicki*, 37 Ohio St 3d 230. The doctrine determines whether a duty in tort exists, not whether an individual is immune from an otherwise existing tort duty. Accordingly, it is part of tort law. As a result, the public-duty doctrine is consistent with 1986 PA 175, MCL 691.1407(2); MSA 3.996(107)(2), and neither *Ross v Consumers Power Co (On Rehearing)*, 420

---

*Ann Arbor*, 417 Mich 461, 470; 339 NW2d 413 (1983), quoting *McKay v Hargis*, 351 Mich 409, 418; 88 NW2d 456 (1958).

Mich 567; 363 NW2d 641 (1984),[9] nor 1986 PA 175 compels this Court to abandon the doctrine.

V

APPLICATION OF THE PUBLIC-DUTY DOCTRINE

With the public-duty doctrine and its special-relationship exception defined, we must now decide whether summary disposition was appropriate in the case before us. We conclude that it was. We employ a two-part analysis to reach this conclusion.

First, we conclude that the public-duty doctrine shields the officer from liability for the charged conduct. Plaintiff's complaint alleges a failure to provide police protection. Therefore, unless the facts of this case fit the special-relationship exception, the public-duty doctrine instructs that the officer did not owe a duty in tort to any individual, including decedent. Second, we find that the facts in this case do not establish a special relationship between the officer and decedent. Employing the newly adopted special-relationship test, we conclude plaintiff has failed to allege at least two of the elements necessary to the establishment of a special relationship.

First, plaintiff did not allege facts sufficient to suggest that there was direct contact between the police officer and decedent. There is no allegation of direct contact before the attack, and during the attack decedent only succeeded in contacting her neighbors—not the police. Second, plaintiff failed to suggest that

---

[9] Assuming for the sake of argument that the public-duty doctrine was part of sovereign immunity, MCL 691.1407(1); MSA 3.996(107)(1) would actually compel this Court to recognize the public-duty doctrine to the extent that the doctrine shields the state from liability. See *id.* at 608 and *Moss v Cummings*, 44 Mich 359; 6 NW 843 (1880).

decedent justifiably relied on any affirmative action taken by the police department. Because decedent never directly contacted the police, she had no knowledge of a promise on which she could rely.

Further, any argument that she relied on the police officer because she knew that it was the officer's "duty" to aid victims of crime runs contrary to our rationale for adopting the public-duty doctrine itself. Such an argument is tantamount to arguing that a tort duty can be established solely on the basis of defendant's job title. Because we adopted the public-duty doctrine in part to protect government employees from liability based solely on their job title, we refuse to allow the exception to contradict the rule.

Therefore, plaintiff has failed to allege facts sufficient to satisfy the special-relationship exception. Under the public-duty doctrine, the police officer did not owe a duty in tort to decedent, an individual. As a result, plaintiff has failed to state a claim on which relief can be granted. Accordingly, we would reverse the Court of Appeals and remand the case to the trial court for entry of an order granting defendant's motion for summary judgment.

RILEY and WEAVER, JJ., concurred with BRICKLEY, C.J.

BOYLE, J. (*concurring*). I concur in the lead opinion to the extent it holds that the waiver of sovereign immunity under MCL 691.1407; MSA 3.996(107) does not create a duty where none existed before and that "[a]pplied to police officers, the public-duty doctrine insulates officers from tort liability for the negligent failure to provide police protection unless an individual plaintiff satisfies the special-relationship exception." *Ante* at 316. I also agree with the adoption by

the lead opinion of the test in *Cuffy v City of New York*[1] for cases of nonfeasance. The special-relationship exception is in essence a variation of the special-relationship standard of traditional negligence law that recognizes that where a "defendant has gone so far in what he has actually done, and has got himself into such a relation with the plaintiff, that he has begun to affect the interests of the plaintiff adversely," Prosser & Keeton, Torts (5th ed), § 56, p 375, the line between active and passive conduct has been crossed and social policy justifies recognition of a duty.

I disagree with broader language in the lead opinion suggesting that the public-duty doctrine applies when an officer's affirmative misconduct causes harm. This inquiry is different from the question whether, under the common law, the officer was liable for misfeasance and whether MCL 691.1407; MSA 3.996(107) definitively sets forth the parameters for such a cause of action against police officers, *post* at 353-355 (LEVIN, J.). The facts of this case do not require us to resolve whether the public-duty doctrine should be applied to insulate government agents who have assumed a duty and whose affirmative misconduct causes harm.

This case is before us on a motion for summary disposition brought pursuant to MCR 2.116(C)(8). Under the rule, summary disposition is granted if the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. Plaintiff's claim is tested by the pleadings alone, and all factual allegations contained in the

---

[1] 69 NY2d 255; 505 NE2d 937 (1987).

complaint must be accepted as true. *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995). In this case, plaintiff's factual allegations in the complaint are, in pertinent part:

> Defendant[ ] Detroit Police Officers[2] . . . arrived upon the scene and were met by . . . decedent's neighbors who explained that [decedent] was in apartment #203, that she had been screaming for help and that they witnessed her being attacked through her bathroom window.
>
> . . . That Defendant Police Officers, after taking down the witnesses' names, simply circled the building and left without ever attempting to knock on . . . decedent's apartment door, or make any attempt to contact . . . decedent or determine if, in fact, she was being or had been attacked.
>
> \*     \*     \*
>
> That . . . decedent died . . . three hours and twenty minutes after Defendant[ ] Detroit Police Officers had arrived on the scene and failed to take action.

Plaintiff alleged in the complaint that this inaction by defendant police officers was grossly negligent, stating:

> In Defendants [sic], Detroit Police Officers, failing to attempt to ascertain . . . decedent's condition, or to render assistance in any way whatsoever when at the scene, and having been informed that . . . decedent had been under attack in her apartment shortly before their arrival;
>
> \*     \*     \*
>
> In Defendant officers [sic] negligently failing to take any actions whatsoever to render assistance to . . . decedent after being apprised that there was a woman, in an identi-

---

[2] Two police officers were named as defendants in the complaint; the only police officer before this Court, however, is defendant Beasley.

fied apartment, screaming for help because her husband was about to kill her.

Clearly, plaintiff is not alleging that defendant Beasley's affirmative actions caused the harm. Rather, plaintiff asserts that his inaction—his failure to render assistance—led to the harm. This is a crucial difference. As we stated in *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988):

> In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another.

Thus, the Court in *Williams* concluded that for a person to be liable for nonfeasance, there must be a "special relationship" that imposes a duty to protect the other. 429 Mich 499. Although the issue in *Williams* involved a private citizen's failure to prevent a criminal assault, the Court's observation applies here. Neither police officers nor private citizens have a duty to rescue at common law. Prosser & Keeton, *supra*, § 56, pp 373 ff. Where liability has been imposed for nonfeasance, it has been on the basis of recognizing an affirmative duty to act based on a special relationship between the plaintiff and the defendant. *Id.* at 373. An allegation that an officer failed to rescue someone in danger is a charge that an officer

has not fulfilled a sworn duty as an officer. MCL 752.11; MSA 28.746(101). However, as Justice CAVANAGH correctly observes, executive decisions regarding use of resources in protection of the general public is of such overarching public importance that declining to impose an affirmative duty under this aspect of the public-duty doctrine continues to serve a vital social purpose. Whether to apply the public-duty doctrine where active misconduct causes a person's injury, however, is a more difficult question.

Review of the special-relationship test found in *Cuffy v City of New York* and adopted by this Court today, suggests that it is meant to apply only in cases of nonfeasance. *Cuffy* explains that its special-relationship test is an exception to the general rule that "a municipality may not be held liable for injuries resulting from a simple *failure to provide* police protection . . . ." *Id.* at 260 (emphasis added). The test allows liability to be imposed on a municipality in the narrow circumstance where there is direct contact between a citizen and an officer, an officer assumes an affirmative duty to act, knows that inaction could lead to harm, and the citizen justifiably relies on the officer's affirmative undertaking. The test, by its own terms, can only be applied in an instance where the officer failed to carry out a promise or an assumed duty to act.

This case, of course, does not involve active misfeasance. At most, defendant Beasley's passive inaction could be said to be inconsistent with his duty to prevent crime or to provide police protection. While the result in this case is harsh, a contrary result could lead to officers arresting (and detaining) all persons

who might conceivably jeopardize a foreseeable plaintiff. Because the specific holding of the lead opinion strikes the appropriate public policy balance, I agree that the public-duty doctrine applies. I also agree that plaintiff's complaint fails to satisfy the *Cuffy* special-relationship test. While the line between nonfeasance and misfeasance is admittedly imprecise, I would explicitly hold that we do not decide the question of the applicability of the public-duty doctrine to affirmative misconduct.

CAVANAGH, J. (*concurring in part and dissenting in part*). I agree with the lead opinion that the public-duty doctrine serves a useful function and should be continued. However, I dissent from the lead opinion's definition of the special-relationship exception to the public-duty doctrine. I would also limit the scope of this opinion to only those cases in which liability is alleged on the basis of the police officer's failure to protect an individual from the actions of a *third party*. This case should have no bearing in a case involving an injury caused by the police officer's own actions.

The "duty to provide police protection . . . is vested in the government by constitution and statute." *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 501; 418 NW2d 381 (1988). The Legislature has provided that government officers and employees are immune from tort liability while engaged in governmental functions if they are acting or reasonably believe they are acting within the scope of their authority and their conduct falls short of gross negligence. MCL 691.1407(2); MSA 3.996(107)(2). However, before reaching any issue of breach, causation, or damages, the first question in any negligence action

involves duty. "Duty exists because the relationship between the parties gives rise to a legal obligation." *Bertrand v Alan Ford, Inc*, 449 Mich 606, 614; 537 NW2d 185 (1995), citing *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977).

The public-duty doctrine begins with the premise that police officers[1] owe a duty to the public to investigate crime and to protect the citizenry *because* they are police officers. Further, the public-duty doctrine recognizes that police officers and their departments must make discretionary or policy decisions in order to carry out the duties imposed on them.[2] For instance, a police station may receive several distress calls at once, and, because of limited resources, must assign a priority to those calls. The legal tort system is ill-equipped to second-guess a discretionary decision to prioritize calls in order of perceived need and availability of officers to respond. Evaluations of the propriety of decisions such as budgetary items, training, equipment, procedures, and response techniques, are best left to the other branches of government. *Cuffy v City of New York*, 69 NY2d 255, 260; 513 NYS2d 372; 505 NE2d 937 (1987) ("a municipality's provision of police protection to its citizenry has long been regarded as a resource-allocating function that is better left to the discretion of the policy makers"). Accordingly, the public-duty doctrine precludes bas-

---

[1] Although I am limiting the focus of my opinion to police officers, I believe that it would similarly apply to fire fighters, life guards, and similar governmental safety professionals.

[2] The Legislature has disregarded any distinction between discretionary or ministerial acts with respect to the tort liability of governmental individuals. MCL 691.1407(2); MSA 3.996(107)(2). However, the distinction remains useful for explaining the policy reasons behind the public-duty doctrine.

ing tort liability solely on the obligations owed by police officers to the public *at large*.[3]

Nevertheless, the special-relationship exception to the public-duty doctrine is based on the recognition that there are situations in which discretionary or policy decisions are no longer at issue because the decision to assist a particular individual has already been made. The issue then becomes whether the police officer's connection to a particular individual has created an actionable special and identifiable obligation to render assistance to that individual. Indeed, the common theme underlying all the various definitions of special relationship explored by the lead opinion is an attempt to test the validity of this connection. When the connection is strong enough so that a relationship between the police officer and the victim arises that is distinct from the relationship between the police officer and the public at large, the courts will impose a special duty.[4] However, I believe that the *Cuffy* test adopted by the lead opinion places unfair obstacles before the potential plaintiffs who

---

[3] See *Verity v Danti*, 585 A2d 65, 66 (RI, 1991):

> The public duty doctrine encourages "the effective administration of governmental operations by removing the threat of potential litigation." It creates immunity for the government regarding certain activities performed by government agents that are discretionary in nature. [Citations omitted.]

[4] This special duty is the duty of due care to perform the police officer's governmental function of providing police protection to the individual with whom a special relationship has been established. See *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 635; 363 NW2d 641 (1984), an officer may be personally liable for "tortiously executing" his police officer duties. See also *Pike v State of New York*, 214 AD2d 934, 935; 625 NYS2d 712 (1995), recognizing that there is generally no liability for a failure to provide police protection, but that a special relationship may give rise "to a special duty of protection."

were the most helpless and the victims of crime most at risk.

The *Cuffy* test requires two primary elements: direct contact and justifiable reliance. I agree that the "contact" element serves a useful function in most situations. In order for tort liability to attach to a grossly negligent response to the plaintiff's peril, the police officer first must have been made aware that the victim may have been in peril. This would normally be accomplished through a call for assistance. However, I would not require the victim himself to have placed the call. Such a rule results in a perverse sliding scale where the more helpless the victim, the more likely that the officer can act, or fail to act, with impunity. For instance, a kidnapping victim should not be denied tort damages *solely* because he could not personally dial 911. Accordingly, I would eliminate the adjective "direct." I would hold that in order to establish the contact element of the special-relationship exception, the plaintiff would have to prove that he, or someone on his behalf, contacted the police.[5]

Here, the victim allegedly called out to her neighbors to call the police, and they did so, *on her behalf*. I would hold that the contact element has been sufficiently established in the plaintiff's pleadings to survive summary disposition under MCR 2.116(C)(8).

My more serious disagreement with the *Cuffy* test is with the "reliance" element. Although the "justifiable reliance" requirement may work satisfactorily with respect to an obligation to protect an individual

---

[5] I would save for another day whether a police officer's actual knowledge of the crime victim's peril would be sufficient in the absence of contact.

from *future* harm, when strictly applied to crimes in progress, it can lead to harsh and seemingly unjust results. The *Cuffy* test leads to an odd unjust result where the victim *least* able to help himself, that is, least able to change the course of his actions, is the one *least* able to "rely" on the police officer's obligation to help him.[6] Instead, I believe that the special-relationship test should flow from the time-honored and fundamental tort principle that people owe a duty to foreseeable plaintiffs. I believe that a foreseeable-plaintiff requirement would make a more logical, flexible, and workable solution to situations where the crime was already in progress at the time the police were contacted.

In such circumstances, I would hold that the plaintiff would have to prove that he was an identifiable foreseeable victim of a crime in progress by establishing the following elements:

(1) the officer actually arrived on the scene;
(2) the officer knew or should have known that an identifiable crime was in progress and that the plaintiff was or would be an identifiable victim;
(3) the officer should have reasonably foreseen that the identifiable victim would suffer further bodily harm if the officer did not intervene;
(4) the officer had the resources available on the scene to render assistance; and

___

[6] See *Cuffy*, 69 NY2d 261 (reliance is found when "a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection").

(5) the officer's intervention could have changed the outcome.

In such a case, the officer should owe a duty actionable in tort to the identifiable foreseeable victim.[7]

The justifiable reliance requirement is not all that different, and I would not oppose its use as an *alternative* theory. "Justifiable" implies that the police officer made a promise to the individual to protect him from some harm, which the police officer should reasonably have foreseen would have led to reliance. Reliance in turn means that the individual altered his course of action.[8] The promise that led to justifiable reliance was no longer a policy or discretionary consideration whether or when to respond to the individual's request for assistance because the decision to respond to the individual had already been made. At that point, it became an actionable special duty to the individual.

Similarly, when the police officer arrives at the scene of a crime in progress, there is no longer at issue a generalized discretionary or policy decision whether or when to respond to a call for assistance. The police officer *has* responded. At that point, the police officer faces a ministerial obligation to perform his police officer's duty to protect *this* victim, who is in peril from *this* crime in progress, by using the specialized training and resources available to him as a

---

[7] Compare with *Quality Court Condominium Ass'n v Quality Hill Development Corp*, 641 A2d 746, 750 (RI, 1994), and *Knudsen v Hall*, 490 A2d 976, 978 (RI, 1985): A special duty may arise if the plaintiffs "have otherwise specifically come within the knowledge of the officials so that the injury to that particularly identified plaintiff can be or should have been foreseen."

[8] *Cuffy*, 69 NY2d 261.

police officer. If intervention could alter the outcome and prevent further bodily harm to the victim, then I believe that the police officer should have a special duty to this foreseeable identifiable victim that is actionable in tort.

Here, the plaintiff has alleged that Officer Beasley arrived at the scene and was informed by neighbors that they had seen and heard Phoebe Obleton being attacked by her husband. The plaintiff has further alleged that, as a result of Officer Beasley's failure to perform his duties, the victim sustained severe stab wounds that caused her death more than three hours later. I would hold that the plaintiff has pleaded sufficient facts to establish that defendant Beasley owed a special duty to the plaintiff to survive the MCR 2.116(C)(8) motion for summary disposition.

I note that in order to succeed at trial, the plaintiff would still have to prove all these allegations and further would have to prove that the police officer's actions were grossly negligent.

I would affirm the decision of the Court of Appeals.

MALLETT, J., concurred with CAVANAGH, J.

LEVIN, J. (*dissenting*). In separate opinions, four of my colleagues conclude that this action cannot be maintained against the defendant police officers. Three justices, in separate opinions, would permit the plaintiff to maintain this action.

The lead opinion rules against the plaintiff on alternative grounds, stating that the officers owed no duty in tort, but, if there was a duty in tort, the action nevertheless cannot be maintained because a special relationship had not been established between the plaintiff's decedent and the officers within the mean-

ing of the special relationship exception to the public-duty doctrine.

A concurring justice so concludes on the alternative grounds that police officers do not have a duty to rescue at common law, and that such nonfeasance cannot give rise to a special relationship within the meaning of the public-duty doctrine, and a failure to rescue can be described as within the ambit of "executive decisions regarding use of resources in protection of the general public . . . ."[1]

Two justices, also expressing their views supportive of the viability of the public-duty doctrine, conclude that a special relationship was established within the meaning of that doctrine, and that the allegations in the complaint were sufficient to permit the issue of the officers' gross negligence to be submitted to the jury.

It appears that the public-duty doctrine is being incorporated into the jurisprudence because of the dangerous working conditions facing police officers, a consideration not applicable to governmental employment generally. The immunity from tort liability for police officers created today by judicial opinion applies only for acts of nonfeasance, such as a failure to rescue, but the implications for the jurisprudence in appearing to adopt the public-duty doctrine may have far-reaching ramifications.

I

In *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 658-659; 363 NW2d 641 (1984), this Court declined to decide whether to adopt the public-

---

[1] *Ante,* p 329.

duty doctrine. Today the Court adopts the public-duty doctrine without consideration of prior Michigan case law, indicating that the public-duty doctrine is not part of the law of this state, and without consideration of 1986 PA 175, which amended § 7 of the governmental tort liability act[2] in a manner that is inconsistent with recognition of a public-duty doctrine.

II

When *Ross* was decided, the governmental tort liability act did "not address whether or when individual officers, employees, and agents are immune from tort liability."[3] This Court said: "Thus, the existence and scope of individual immunity continues to be a creature of judicial decision-making." *Id.* at 629.

*Ross* continued that *Bush v Oscoda Area Schools*, 405 Mich 716; 275 NW2d 268 (1979), and *Lockaby v Wayne Co*, 406 Mich 65; 276 NW2d 1 (1979), had "obfuscated the precise parameters of individual immunity," with *Lockaby* adding "to the confusion."

After further reviewing the intervening case law, the Court held that judges, legislators and the highest executive officials of all levels of government were absolutely immune from all tort liability when acting within their judicial, legislative, or executive authority. The Court declared that lower level officials, employees and agents were immune only when they were

---

[2] MCL 691.1407(2); MSA 3.996(107)(2). See n 36 for text of subsection 7(2).

[3] *Ross, supra,* p 628. The act authorized governmental agencies to defend, indemnify and insure officers and employees. MCL 691.1408; MSA 3.996(108); MCL 691.1409; MSA 3.996(109).

1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority;

2) acting in good faith; and

3) *performing discretionary, as opposed to ministerial acts.*

Under this test, no individual immunity exists for *ultra vires* activities.[4]

The Court then proceeded to define "discretionary" and "ministerial acts," adding for clarity "the word 'decisional,'" so the operative term would be "discretionary-decisional" acts.[5]

### III

Within a year and a half, the Legislature responded to *Ross* with the enactment of 1986 PA 175. The House Legislative Analysis observed that the statute dealt with in *Ross* did not address officer-employee immunity, but traditionally those "individuals have been absolutely immune from tort liability when engaged in discretionary, as opposed to ministerial, acts within the scope of their authority."[6] The House Analysis continued that "[t]wo 1979 Michigan Supreme Court decisions, however [undoubtedly *Bush v Oscoda* and *Lockaby v Wayne Co*], confused the issue by tending to define individual immunity with respect to '*governmental function,*' *i.e., whether the individual was performing primarily discretion-*

---

[4] *Ross, supra,* pp 633-634 (emphasis added).

[5] *Id.,* p 634.

[6] House Legislative Analysis, HB 5163 (Substitute H-2), First Analysis, November 19, 1985, p 1.

*ary activities that were of the essence to government.*"[7]

The analysis further continued that the 1986 legislation would define governmental function as it was defined in *Ross*,[8] and would eliminate the discretionary-ministerial distinction, providing expressly that *"without regard to the discretionary or ministerial nature of the conduct in question"* (emphasis added), a governmental employee would be immune if:

(a) He or she is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. [MCL 691.1407(2); MSA 3.996(107)(2).]

Despite the clear legislative decision, following a careful analysis of *Ross*, and earlier decisions of this

---

[7] *Id.* (emphasis added).

[8] *Ross* defined governmental function as follows:

We therefore conclude that a governmental function is an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. [420 Mich 620.]

The analysis stated:

The bill would define "governmental function" as an activity which is expressly or impliedly mandated or authorized by constitution, statute, chapter [sic], ordinance, or other law. [House Legislative Analysis Section, HB 5163 (Second Analysis), January 16, 1986.]

See text accompanying n 43 for definition of governmental function enacted by 1986 PA 175.

Court,[9] to abrogate, except for the highest officers, individual officer and employee immunity from tort liability based on either governmental function or the discretionary-decisional nature of the activity, the majority reinstates governmental immunity by substituting "policy" decision for "discretionary" decision.[10] That policy decisions and discretionary decisions are one and the same appears from the following, cited by the lead opinion:

> Because of the unusual and extraordinary nature of police work it is *unfair* to allow "a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's *discretionary* professional duty."[11] [Emphasis added.]

---

[9] The 1986 legislation expressly preserved the distinction drawn by this Court in *Parker v Highland Park*, 404 Mich 183; 273 NW2d 413 (1978), holding that the operation of a general hospital by a city is not a governmental function, and *Perry v Kalamazoo State Hosp*, 404 Mich 205; 273 NW2d 421 (1978), holding that the operation of a mental hospital by the state was immune.

The act provides:

> This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital or county medical care facility or to the agents or employees of such hospital or county medical care facility.

> \* \* \*

> "Hospital" means a facility offering in-patient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician. The term does not include a hospital owned or operated by the department of mental health or a hospital operated by the department of corrections.

[10] The lead opinion states that the public-duty "doctrine protects governments from unreasonable interference with policy decisions . . . ." *Ante*, p 317.

[11] *Ante*, p 321. This is a quotation from *Shore v Stonington*, 187 Conn 147, 157; 444 A2d 1379 (1982), which was decided in a state that applies a

The concurring-dissenting opinion similarly states that the public-duty doctrine recognizes that police officers and their departments must make discretionary or policy decisions to carry out the duties imposed on them. The opinion also similarly expresses the author's and signer's belief that the "tort system is ill-equipped to second-guess a discretionary decision . . . ."[12] Still later: "recognition that there are situations in which discretionary or policy decisions are no longer at issue . . . ." *Ante,* p 332. Still later: "a policy or discretionary consideration"; "there is no longer at issue a generalized discretionary or policy decision"; "the police officer faces a ministerial obligation to perform his police officer's duty . . . ."[13]

IV

It is clear that the majority is substituting its belief that police officers, because of the dangerous character of their work—adverted to in the *Zavala* segment of *Ross* (see text accompanying n 25), of which the Legislature, in its careful review of *Ross*, also became aware—should be immune because they are confronted with difficult decisional choices.

The Legislature was fully aware that police officers are engaged in dangerous work and are called upon to make difficult choices, but decided nevertheless to eliminate the discretionary-decisional (policy)/ministerial distinction, and to hold governmental officers

---

simple negligence standard, not gross negligence. "The issue presented in this appeal is whether the plaintiff . . . has a cause of action *in negligence* against the officer and the town[.]" *Id.,* p 148 (emphasis added).

[12] *Ante,* p 331.

[13] *Id.* p 335.

and employees, except those at the highest levels, subject to liability on the basis of gross negligence, defined as reckless conduct.

The lead opinion compounds its failure to comply with the legislative directive, and the substitution of its policy choices for the legislative policy choice that no governmental employees including police officers—except those at the highest level of government—should be immune because they are called upon to make difficult policy decisions, but rather should be subject to liability for gross negligence, defined as reckless conduct, by stating that no liability arises because the defendant officers owed no duty to the plaintiff's decedent.

The lead opinion asserts that no duty arises under state statutes because, in order to be subject to liability in tort, the duty must be expressed in terms of tort liability. Since only rarely does a statute expressly provide for tort liability, the lead opinion could stop there and direct that plaintiff's complaint be dismissed. There is no need to incorporate the public-duty or special relationship doctrines for police officers, and potentially for other governmental employees.

V

The majority states that "the public-duty doctrine is a doctrine of tort law."[14] Whether labeled a doctrine of tort law, or a doctrine of governmental immunity, or a revelation, it is a common-law creation of this Court that provides police officers with de facto immunity.

---

[14] *Ante*, p 323.

The statute sets July 1, 1965, as the date as of which common-law immunity is to be determined.[15] If this Court were free to continue to engage in so-called common-law development of tort law—for governmental liability and immunity purposes only—plaintiffs might someday argue for this Court to readopt its position in *Pittman v City of Taylor*, 398 Mich 41; 247 NW2d 512 (1976), where this Court abrogated common-law immunity. Section 7(1) indicates the Legislature's intent to halt common-law development after July 1, 1965. The majority assumes the power to create another layer of immunity, in the guise of a tort law doctrine, for which there was no precedent in 1965.[16]

The legislative intent expressed in subsection 7(1) is clear: the courts are not to continue to write governmental immunity law, whether under one label or another.

The signers of the lead opinion err in asserting that 1986 PA 175 "is consistent with" their expansion of governmental immunity.[17] The lead opinion's error is highlighted in its footnote 9, where it states that § 7(1) would actually compel this Court to recognize the doctrine "to the extent that the doctrine shields the state from liability." The 1986 act supplanted *Ross* and other decisions after July 1, 1965. The public-duty doctrine had not been adopted in any reported appellate judicial opinion in this state before July 1,

---

[15] MCL 691.1407(1); MSA 3.996(107)(1), states: "Except as otherwise provided in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability *as it existed before July 1, 1965*, which immunity is affirmed." (Emphasis added.)

[16] The decisions of the Court of Appeals cited by the majority extend back no further than 1970. *Ante*, p 322, n 7. See n 38.

[17] *Ante*, p 323.

1965. Subsection 7(1) is not a mandate to this Court to adopt all mechanisms that shield the state from liability.

Before the 1986 amendments, *Ross* established the common-law liability of lower level governmental employees by providing immunity for all acts that were discretionary-decisional, while providing for liability when a ministerial-operational function was performed negligently.[18] The 1986 legislation changed the law of immunity by *increasing* the immunity of lower level employees for ministerial acts, allowing liability only when the conduct constituted gross negligence, rather than simple negligence. At the same time, however, the act *decreased* immunity by allowing liability to attach for grossly negligent discretionary-decisional actions, actions that had previously been completely immune from liability (absent exceptions not relevant here, such as intentionally tortious acts). This is the only reading of 1986 PA 175 that gives full effect to the abolition of the discretionary/ministerial distinction and the establishment of gross negligence as the standard of care.[19]

---

[18] 420 Mich 633-634.

[19] Examples of ministerial duties, both public and private in nature, which could form the basis for liability, include "the preparation of ballots, the registration of voters, the recording of documents, the filing of papers, the care of prisoners, the driving of vehicles, the repair of highways, the collection of taxes, the signing of licenses once they are authorized, the taking of acknowledgements, and dipping sheep." Prosser, Torts (4th ed), § 132, p 990. Prosser further notes that there is no reason to distinguish "between ministerial 'misfeasance' and 'nonfeasance.' If there is a clear duty to act at all, liability may be predicated quite as readily upon nonaction as upon action." *Id.*, pp 990-991. Thus, negligent failure to prepare ballots at all is as culpable as negligent failure to prepare ballots properly, even though the duty of a ballot preparer is to the public at large to ensure the proper exercise of the franchise.

The lead opinion argues "that the dangerous work environment inherent in police activities is a counterbalancing concern" when deciding whether the public-duty doctrine should be adopted.[20] This is the same reason this Court advanced in the *Zavala* segment of *Ross* to justify insulating the officers involved on the basis of the discretionary nature of their inaction.[21]

VI

The lead opinion states that the question presented is whether "the public-duty doctrine should *still* be recognized in Michigan," and "conclude[s] that the public-duty doctrine *remains* valid in Michigan."[22] (Emphasis added.) The concurring-dissenting opinion similarly asserts that the public-duty doctrine "should be *continued*."[23] (Emphasis added.) When so asserting, neither opinion discusses prior Michigan case law, nor does either opinion state when, before the 1986 legislation was enacted, the public-duty doctrine was adopted.[24]

A

*Ross* was one of nine cases consolidated on appeal, decided in one opinion entitled *Ross v Consumers Power Co (On Rehearing).* In one of the cases,

---

[20] *Ante,* p 317.

[21] Police officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers. [420 Mich 659.]

[22] *Ante,* p 313.

[23] *Id.,* p 330.

[24] See n 38.

*Zavala v Zinser*, 123 Mich App 352; 333 NW2d 278 (1983), a divided Court of Appeals dismissed an action against police officers on the basis of the public-duty doctrine.[25]

This Court expressly declined in *Ross* to decide whether to adopt the public-duty doctrine,[26] and ruled that summary judgment was properly granted, dismissing the action against the police officers, because the "plaintiffs merely alleged negligent performance of a discretionary-decisional act . . . ."[27] The Court thus predicated affirmance of the Court of Appeals decision on the discretionary-ministerial distinction, not on the public-duty doctrine.

B

The lead opinion, in holding that the public-duty doctrine applies in Michigan, quotes Justice COOLEY's description of the public-duty doctrine in his treatise on the law of torts.[28] Justice COOLEY's treatise, as edited in the 4th edition, cited one Michigan case, his opinion for the Court in *Moss v Cummings*, 44 Mich 359; 6 NW 843 (1880). There, a tax assessor was alleged to have undervalued property in his jurisdiction. Landowners sued for recovery of taxes they had paid on the theory that the assessor's undervaluation

---

[25] Subsequent decisions of the Court of Appeals have embraced the public-duty doctrine, but this Court has not heretofore returned to decide the question it left open in *Ross*. See n 38.

[26] As to the liability of the individual officers, we need not decide the "public/individual" duty issue or whether the "special relationship" allegations were legally sufficient, since we conclude that the officers are entitled to individual immunity from tort liability. [*Ross, supra*, pp 658-659.]

[27] See text accompanying n 5 for source of "discretionary-*decisional*."

[28] *Ante*, p 316, quoting 2 Cooley, Torts (4th ed), § 300, pp 385-386.

was illegal and therefore any tax collection was void. This Court rejected the landowner's claim:

> The failure to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance. [*Id.* at 360-361.]

The Court observed, however, that *an action would lie* for overvaluation of the property: "We have held that the collection of the tax levy might be restrained in such a case, so far, at least, as it was excessive." *Id.* at 361.

Thus, if the plaintiff could show injury, such as a landowner whose property was overvalued, an action would lie even though the tax assessor's duty was to the public at large.[29] *Moss v Cummings* was essentially a standing, not a public-duty, case.

This becomes even clearer upon consideration of *Raynsford v Phelps*, 43 Mich 342; 5 NW 403 (1880), decided shortly before *Moss v Cummings* was decided. There Justice COOLEY, again writing for the Court, declared that an action could be maintained against a tax collector who had negligently allowed a tax lien to attach to a parcel of real estate, forcing the mortgage holder to redeem the property at a tax sale. The mortgagee sought to collect his damages, with the tax collector arguing that he owed no duty to individuals. This Court held that an action could be maintained because there was a *special injury*:

---

[29] Under the majority's definition of a special relationship, I doubt the landowner would qualify. The government official can assess the value of land without direct contact with the landowner, and the only "reliance" by the landowner is in paying the tax like other landowners.

It is *immaterial* that the duty is one primarily imposed on public grounds, and therefore *primarily a duty owing to the public*: the right of action springs from the fact that the private individual receives a special and peculiar injury from the neglect in performance, which it was in part the purpose of the law to protect him against.

\*    \*    \*

[The plaintiff] has a right to understand that the officer is commissioned by the law to act only with due respect to the rights of individuals, and that if he acts otherwise and causes special injury, he disobeys his commission and is not within the protection the commission might otherwise give. [*Id.*, pp 345-346 (emphasis added).][30]

More recently, at a time when this Court was composed of the same persons who composed the Court when *Ross* was decided,[31] this Court decided *Fiser v City of Ann Arbor*, 417 Mich 461; 339 NW2d 413 (1983), holding that an action could be maintained against police officers for their negligence in a high speed chase that caused the suspect to crash into the plaintiff's vehicle.[32] The Court found a specific duty under general statutes regulating police conduct on the roadways that the defendants had claimed was a "duty they owe to the public." *Id.*, p 470.[33]

---

[30] Similarly, the police have a statutory obligation to enforce the laws. If they perform their job in a grossly negligent manner, they are no longer within the protection the statutes might otherwise provide.

[31] Justice BOYLE did not participate in *Fiser*. Justice KAVANAGH did not participate in *Ross*.

[32] The action was against the City of Ann Arbor, three Ann Arbor police officers, and the driver and owners of an automobile that struck the plaintiff's vehicle during the high-speed chase.

[33] See also *Stevens v Black*, 212 Mich 281; 180 NW 503 (1920), where the Court extensively discussed with approval foreign jurisdiction case law stating public employees could be held liable for some breaches of their official duty, although the discussion was dicta because the Court

Section 5 of the governmental tort liability act,[34] providing that *governmental agencies* are subject to liability for the negligent operation of a motor vehicle by an officer, agent, or employee, was involved. The Court quoted from *McKay v Hargis*, 351 Mich 409; 88 NW2d 456 (1958), where this Court

> set out the standard by which to determine a claim of negligence on the part of a police officer. The officer's conduct should be compared to "that care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances." [*Id.*, p 470.]

Justice RYAN, writing for three members of the Court, concurred in remanding the case for trial, and adverted to the discretionary-ministerial distinction.[35]

VII

Within a year and a half after *Ross* was decided, the Legislature enacted 1986 PA 175, abolishing the discretionary-ministerial distinction relied on in *Ross* in affirming the dismissal of plaintiff's action in *Zavala v Zinser*, and adverted to in the concurring opinion in *Fiser*, and carefully defined and limited the liability of governmental employees to situations where their conduct amounts to gross negligence that is the proximate cause of injury or damage, meaning "conduct

---

found the defendant acted without statutory authorization and could be held liable on that basis.

[34] MCL 691.1405; MSA 3.996(105).

[35] [I]t is immaterial whether the decision to pursue and the actual pursuit were discretionary or ministerial acts because if the city has no immunity defense, neither do the police officers. See *Lockaby v Wayne Co*, 406 Mich 65; 276 NW2d 1 (1979). [*Id.*, p 477.]

so reckless as to demonstrate a substantial lack of concern for whether an injury results."[36]

A

The Legislature, in enacting 1986 PA 175, delineated the parameters of actions against government employees.

Neither the Court of Appeals nor this Court has analyzed the effect of 1986 PA 175 on Court of Appeals case law concerning the public-duty doctrine. Under the circumstance that the issue has been briefed, this Court should review 1986 PA 175 to determine if a public-duty doctrine is consistent with the 1986 amendments.

The Legislature has created a comprehensive scheme of tort liability for governmental employees, including providing immunity to employees if they meet all the criteria listed in subsections a, b, and c. (See n 36.) If these criteria are not met, the statute allows a cause of action.

---

[36] (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . shall be im une from tort liability for injuries to persons or damages to property caused by the officer . . . while in the course of employment or service . . . while acting on behalf of a governmental agency *if all of the following are met*:

(a) The officer . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results. [MCL 691.1407(2); MSA 3.996(107)(2) (emphasis added).]

The majority adds an additional prong to the test: At least in the case of police officers, and possibly others, even if they fail to meet the criteria of § 7(2), there will still be immunity if the officer's responsibility is characterized as a duty to the public at large and the conduct alleged did not establish a judicially created and defined "special relationship" between the victim and the officer.

These additional requirements are not required to save the statute from constitutional infirmity, nor are they a reasonable construction of the text.[37] The public-duty doctrine is a judicial creation that engrafts additional requirements inconsistent with the language chosen by the Legislature.

The reasons advanced by the majority for adopting the public-duty doctrine are policy judgments that the Legislature was able to review when it enacted § 7(2).

The Legislature has provided what it determined to be sufficient protection for all governmental employees by requiring a showing of gross negligence. If police officers require additional protection, the policy arguments contained in the majority opinion will serve them well. In a court of law, those arguments should not.

While this Court has held that exceptions to the statutory immunity are to be strictly construed, it is not this Court's role to *eliminate* causes of action the Legislature has granted, nor is it our role to protect the government from suits. Our obligation is to construe the statutory provisions involved, including eval-

---

[37] The silence of my colleagues' opinions on these and other *legal* issues, rather than the policy considerations prominent throughout their discussions of the public-duty doctrine, underscores that the Court is delving into public policy concerns more appropriate for the Legislature.

uating common-law doctrines that might or might not have been adopted before the enactment of these statutory provisions, and determine if they are consistent with the legislative enactment.[38]

B

The public-duty doctrine, as articulated by the majority in separate opinions, serves to shield the government from liability despite grossly negligent conduct by its employees, in contravention of the Legislature's decision to limit immunity and provide for liability for gross negligence. As stated by the Alaska Supreme Court:

> [W]e consider that the "duty to all, duty to no-one" doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine. [*Adams v State*, 555 P2d 235, 241 (Alas, 1976).][39]

---

[38] The lead opinion states that "[i]n recent years the Court of Appeals has consistently relied on the [public-duty] doctrine" as support for the assertion in the lead opinion that "the public-duty doctrine is a part of the law of this state" although this Court, in *Ross*, declined to adopt the public-duty doctrine. *Ante*, p 322.

One Court of Appeals decision, that adverted to decisions in other jurisdictions that had adopted the public-duty doctrine, *Rose v Mackie*, 22 Mich App 463; 177 NW2d 633 (1970), preceded the decision in *Zavala*, which led this Court in *Ross* to decline to adopt the public-duty doctrine.

The Legislature, in its careful review of *Ross* and earlier decisions of this Court, was surely aware of *Zavala* and this Court's decision in *Ross* not to adopt that doctrine when it enacted the 1986 legislation eliminating the discretionary/ministerial distinction. Had the Legislature wished to incorporate the public-duty doctrine, it could have done so, but then it would have been faced with the same quandary that will face this Court in future cases—how to reconcile a public-duty doctrine with the concept that governmental employees are not immune from liability, but, rather, are subject to liability for gross negligence in the performance of their governmental functions.

[39] To say that there is no duty is, of course, to start with the conclusion. The question is whether or not there should be liability for the negligent failure to provide adequate police protection. [*Riss v*

The police have a duty under state law and the Charter of the City of Detroit to protect the public and to perform their jobs with due care.[40] These legislative pronouncements state a police officer's duty in mandatory terms.

The Legislature has thus created the cause of action for breach of a policeman's duty. I do not

---

*City of New York*, 22 NY2d 579, 585; 240 NE2d 860 (1968) (Keating, J., dissenting).]

[40] A state statute has long provided:

It *shall* be the duty of the police and nightwatchmen and officers of the force under the direction of the mayor and chief of police, and in conformity with the ordinances of the city, and laws of the state, to suppress all riots, disturbances and breaches of the peace and to pursue and arrest any person fleeing from justice in any part of the state; to apprehend any and all persons in the act of committing any offense against the laws of the state, or the ordinances of the city, involving a breach of the peace, and to take the offender forthwith before the proper court or magistrate, to be dealt with for the offense; to make complaints to the proper officers and magistrates of any person known or believed by them to be guilty of the violation of the ordinances of the city, or the penal laws of the state; and at all times diligently and faithfully to enforce all such laws, ordinances and regulations for the preservation of good order and the public welfare as the council may ordain; and to serve all process directed or delivered to them for service, and for such purposes the chief of police, and every policeman and nightwatchman, shall have all the powers of constables, and may arrest upon view and without process, any person in the act of violating any ordinance of the city involving a breach of the peace, or of committing any crime against the laws of the state. The chief of police and any policeman may serve and execute all process in suits and proceedings for violations of the ordinances of the city, and also any other process which, by law, a constable may serve. [MCL 92.4; MSA 5.1752 (emphasis added).]

The Detroit City Charter, ch 11, § 7-1101 provides:

The police department *shall* preserve the public peace, prevent crime, arrest offenders, protect the rights of persons and property, guard the public health, preserve order, and enforce the laws of the state and the nation and the ordinances of the city. [Emphasis added.]

argue for creation of a common-law duty, but merely
recognition of the statutory duty the Legislature has
imposed on police officers.[41] Section 7(2) does not
define the scope of a governmental employee's duty.
That duty is expressed in the enactments of the Legis-
lature and in the Detroit City Charter, the very same
provisions of law relied on to define "governmental
function," which, under *Ross*, as codified in the 1986
legislation, immunizes the City of Detroit from
liability.[42]

The elimination of the pre-1986 discretionary-
ministerial distinction evidences a legislative intent to
avoid the inquiry otherwise necessary to determine
whether a duty is owed.

Moreover, the 1986 legislation defines the duty pur-
suant to which a governmental employee is subject to
liability. Section 7(2)(c) provides immunity to a gov-
ernmental employee whose "conduct does not
amount to gross negligence," *when* the governmental
agency for whom the governmental employee is

---

[41] Thus, the lead opinion's quotation from *Riss, ante,* p 319, that it is
not "[f]or the courts to proclaim a new and general duty" is inapposite. I
would not proclaim a new duty; I would merely enforce the duty the Leg-
islature has seen fit to impose.

[42] The lead opinion also asserts that "duty" as used in these legal pro-
nouncements does not actually mean "duty," but rather a nonbinding list
of tasks. *Ante,* p 323. However,

"A duty, in negligence cases, may be defined as an obligation, to
which the law will give recognition and effect to conform to a par-
ticular standard of conduct toward another." Prosser, Torts (4th
ed), § 53, p 324. The terse legal conclusion that a duty is owed by
one to another represents a judgment, as a matter of policy, that
the latter's interests are entitled to legal protection against the for-
mer's conduct. [*Antcliff v State Employees Credit Union,* 414 Mich
624, 630-631; 327 NW2d 814 (1982).]

working "is engaged in the exercise or discharge of a *governmental function.*" (Emphasis added.)

*Governmental function* is defined as "an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law."[43]

The combining in § 7(2) of these factors, all of which must be met, for there to be immunity, obliges this Court to find grossly negligent conduct to be actionable when an employee is engaged in a governmental function, because, if the employee were not so engaged, there would be no immunity, the gross negligence standard would not apply, and then the officer would be subject to personal liability for ordinary negligence. Because defendant officers were engaged in a governmental function, the scope of their duty is determined by the scope of the governmental function in which they were engaged.

C

Many duties recognized in tort are "public" in that the duty does not specifically run to one person or group of persons. Motorists driving on Michigan roadways owe a duty to all drivers, passengers, pedestrians, and property owners (i.e., the public generally) to operate their vehicles with due care. While a driver may only be sued for breach of this duty by someone injured because of the breach, the duty is not a limited one running only from the motorist to the victim.[44]

_____

[43] MCL 691.1401(f); MSA 3.996(101)(f).

[44] 1 Restatement Torts, 2d, § 4, p 7, employs duty "to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to

Because a breach by a person who is not a governmental employee of a duty owed to the general public is actionable by one private citizen against the other, it is apparent that merely because a particular duty may be owed to the general public does not justify the conclusion that the breach is not actionable. The emptiness of the concept that a duty to all is a duty to none, or at least not actionable by anyone once characterized as a "public duty," emphasizes that the majority's conclusion is another ipse dixit resurrecting sovereign immunity under another name.

D

The lead opinion contends that "the public-duty doctrine serves a useful purpose by protecting governments from unreasonable interference with policy decisions."[45] The concurring-dissenting opinion similarly argues: "The legal tort system is ill-equipped to second-guess a discretionary decision."[46]

The majority's analysis is rooted in a mistrust of the legal system, so stated in the opinions of the majority, who fear liability will be imposed because of inappropriate second-guessing by juries of what police officers should have done in a particular circumstance. Judges, however, will properly instruct juries on the law, including § 7(2)(c)'s requirement of prov-

---

whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause." As comment *a* explains, "The breach of a duty . . . does not make the actor liable. It merely subjects him to liability." Imposition of liability requires the tortfeasor's conduct to be a legal cause of the victim's injury and the lack of an applicable defense for the tortfeasor. *Id.*, § 5, p 9.

[45] *Ante*, p 317.

[46] *Ante*, p 331.

ing gross negligence, and juries will generally bring in a result pursuant to law.

In those instances where the jury might act inappropriately the trial court may grant a motion for directed verdict, grant judgment notwithstanding the verdict, or order a new trial, either without condition or, under remittitur, require a party to accept a lesser verdict to avoid a new trial. An aggrieved party may seek relief in the Court of Appeals. With these protections, local police departments need not fear they will face unreasonable burdens.

The concurring-dissenting opinion argues: "Evaluations of the propriety of decisions such as budgetary items, training, equipment, procedures, and response techniques, are best left to the other branches of government."[47] To the extent these policy decisions are made by the government itself, immunity will continue to protect that entity, as it protected the City of Detroit in this case.

Nor are those concerns relevant in the instant case. A decision was made to dispatch the defendant officers to the scene. The relevant inquiry under the 1986 legislation is whether the officers performed their duty without gross negligence once they arrived on the scene. There is no risk that police departments will cease responding to distress calls because of the fear of liability.[48]

---

[47] *Ante*, p 331.

[48] There is every reason to believe, however, that imposing liability for gross negligence, once a call has been responded to, will encourage police officers to do their jobs properly. Note, *Government liability and the public duty doctrine*, 32 Vill L R 505, 530, 538-540 (1987), states:

[I]mposing liability on police merely provides an incentive for law enforcement officers to perform their preexisting job responsi-

The policy arguments relied on by the majority, including the fear of exposing the government to "excessive" liability, were

> rejected with the abrogation of absolute sovereign immunity and should likewise be rejected as a policy basis for the public-duty rule. The argument is particularly compelling if the public-duty doctrine is seen as a function of sovereign immunity, rather than as an independent concept of negligence.[49]

As expressed by the Arizona Supreme Court: "We are also told that not only will the public treasury suffer but government will come to a standstill because its agents will be afraid to act. We can't but recall the dire predictions attendant to the publication of the

---

bilities adequately. . . . Furthermore, public indignation usually accompanies a tax increase of any kind. It is submitted that the public fury accompanying a preventable tax increase, necessitated by adverse police nonfeasance judgments, would provide a powerful incentive for an agency to reform its practices adequately. . . .

[B]y abrogating the public duty doctrine a clear message will be sent to law enforcement agencies, that lackadaisical responses to pleas for protection will no longer be tolerated. Agencies suffering large damage judgments must modify their practices to limit exposure to liability as an ordinary citizen or company would. By modifying their practices where necessary, police will increase public confidence in law enforcement agencies.

[49] *Leake v Cain*, 720 P2d 152, 159 (Colo, 1986), citing *Commercial Carrier Corp v Indian River Co*, 371 So 2d 1010, 1015 (Fla, 1979), where the Supreme Court of Florida said:

> [W]e believe it to be circuitous reasoning to conclude that no cause of action exists for a negligent act or omission by an agent of the state or its political subdivisions where the duty breached is said to be owed to the public at large but not to any particular person. . . . [I]t is clear that the [public duty] doctrine is a function of municipal sovereign immunity and not a traditional negligence concept which has meaning apart from the governmental setting. Accordingly, its efficacy is dependent on the continuing vitality of the doctrine of sovereign immunity.

[Arizona decision abolishing complete governmental immunity]. Arizona survived!"[50] Not only has Arizona survived, at least a dozen states have managed to continue providing police protection, directing emergency call responses, and otherwise making the decisions necessary to continue modern government.[51]

Moreover, once a plaintiff has alleged sufficient facts to hold an officer subject to liability pursuant to § 7(2), the officers and, because officers will generally insist on indemnification, the municipality, will "bear the burden of damages as opposed to the innocent victim, because even a small municipality normally has financial resources far beyond those of a private citizen."[52]

The Supreme Court of Colorado said:

> Perhaps the most persuasive reason for the abandonment of the public duty rule is that it creates needless confusion in the law and results in uneven and inequitable results in practice. As the Supreme Court of Arizona said in abandoning the public-duty rule, "[w]e shall no longer engage in the speculative exercise of determining whether the tortfeasor has a general duty to the injured party, which spells no recovery, or if he had a specific individual duty which means recovery." *Ryan* [*v State*, 134 Ariz 308; 656 P2d 597

---

[50] *Ryan v State*, 134 Ariz 308, 309; 656 P2d 597 (1982).

[51] Van Valkenburgh, *Massachusetts General Laws Chapter 258, § 10: Slouching toward sovereign immunity*, 29 New Eng L R 1079, 1090, n 91 (1995), enumerates twelve states that had abolished the public-duty doctrine as of 1994. They are Alaska, Arizona, Colorado, Florida, Iowa, Louisiana, Nebraska, New Hampshire, New Mexico, Oregon, Wisconsin, and Wyoming.

[52] Note, *Government liability*, n 48 *supra*, p 537. The Supreme Court of Alaska has expressed similar reasoning. Alaska's statute defining liability, "in establishing a procedure for suits against the state in tort, represented the adoption in Alaska of the policy of risk-spreading, the policy that society, rather than the injured individual, should bear the cost of the state's negligence." *Adams* at 244.

(1982)]. [*Leake v Cain*, 720 P2d 152, 159 (Colo, 1986) (citations omitted).]

Michigan has not heretofore engaged in such complicated analysis under the public-duty doctrine, but engaged in a similar inquiry under the now-rejected discretionary/ministerial distinction. It was rejected before and should be rejected again.

The public-duty doctrine has come under considerable criticism in other courts and in scholarly writings.[53] Where a state legislature has statutorily defined the limits of tort liability, as has the Michigan Legislature, the public-duty doctrine is no more than sovereign immunity brought back to life, in the face of the legislative enactment.

---

[53] Judge Keating, dissenting in *Riss*, noted that the majority in that case rested its decision "upon a legal rule which long ago should have been abandoned, having lost any justification it might once have had. Despite almost universal condemnation by legal scholars, the rule survives, finding its continuing strength, not in its power to persuade, but in its ability to arouse unwarranted judicial fears of the consequences of overturning it." *Id.*, n 39 *supra*, p 583.