**QUALITY COURT CONDOMINIUM ASSOCIATION**

v.

**QUALITY HILL DEVELOPMENT CORPORATION et al.**

No. 93–201–A.

Supreme Court of Rhode Island.

May 18, 1994.

Mortimer C. Newton, Providence, for plaintiff.

Christopher Fay, City Sol., Pawtucket, for defendant.

## OPINION

MURRAY, Justice.

This case came before this court on the appeal of the defendant, the city of Pawtucket (city), from a judgment on a Superior Court jury verdict in favor of the plaintiff, Quality Court Condominium Association (Quality), in the amount of $69,463.

The facts underlying this dispute are as follows. In August 1988 Quality filed a complaint against several defendants in Superior Court, seeking damages associated with the improper construction of certain condominiums located in the city. Quality is composed of a group of the condominium's unit owners. The original suit was brought against Quality Hill Development Corporation, the seller of the condominiums; Welch Corporation, the builder; Christine Tague, as treasurer of the city; and four other defendants who were subsequently dismissed from the case.

In its complaint Quality alleged that the condominiums were not constructed in a workmanlike manner and that defendants failed to repair damage that Quality had requested be fixed. Quality also asserted that the building inspectors for the city were negligent in failing to inspect the condomini-

ums properly and in approving construction work that was in violation of state building-code requirements.

The matter was subsequently assigned to the Superior Court Arbitration Unit. The court-appointed arbitrator awarded Quality $71,007. The city rejected the award, and the case proceeded to trial. We summarize the facts adduced at trial insofar as they are pertinent to the city. We note that the record represents what may be described as a first-time homeowner's worst nightmare.

Several condominium owners testified at trial regarding a myriad of problems that they experienced with their units soon after their purchase. Elizabeth Healy (Healy) testified that she purchased her unit in August 1986 for $92,000. She stated that her problems began the day before the closing, when she discovered water in her basement. In February 1987 she came home one evening and "my dining room table * * * was covered with water * * *. I put the light on and the water was pouring out of my light fixture and you could hear the water running right in the walls like a waterfall * * * and water was coming out [of] the light fixture at the front door." These water problems also surfaced in other areas. She described "drastic" leaks in her roof, from which leaking water damaged carpets, ceilings, and closets. Healy also stated that the floor in her unit tilts downward and that a supporting wall had to be installed across the middle of her basement to prevent further damage. She described cracks in her ceilings, walls, and kitchen formica. She added that her unit has been repainted on three occasions, yet water damage is still visible.

Robert Girouard (Girouard) testified that he also purchased his unit in August of 1986. Girouard testified that he had many concerns regarding the construction of his unit. He

stated that he spoke to Todd Olbrych (Olbrych), a city building inspector, when Olbrych was inspecting Girouard's unit in November 1986. Girouard testified that Olbrych informed him he was at the site to "issue letters of certificates of occupancy." Girouard also averred that Olbrych informed him it was "obvious" that the city could not issue a certificate of occupancy because the "unit was not ready." Girouard testified that he pointed out to Olbrych problems with the floor joists in the basement, water· leaks, ceiling stains, and joist spans in excess of fourteen feet.[1] Girouard testified that in spite of his pointing out the problems and Olbrych's initial comments, Olbrych stated that "the plans were stamped by the architect and that * * * he [had] to go by the stamp of the architect."

Upon moving into the premises, Girouard testified that he experienced problems similar to those that Healy described, and in addition he noted that his floors did not appear to be nailed down properly. He stated that his floors and his staircases began to "sag" and "everything seemed to be running towards the center of the unit." Girouard and several other unit owners testified that they repeatedly complained to the builder and to the seller of the condominium to correct the problems; however, they were not corrected.

Olbrych testified that as the city building inspector one of his responsibilities was to enforce the Rhode Island State Building Code. He testified that he inspected the Quality Court Condominiums. He stated that he was concerned about the span of the joists that Girouard had pointed out; however, "[i]t was approved by the architect as being structurally sound." He averred that the building code requires that the city "take the architect['s] stamp; so we did."[2] He

---

1. A joist is one of a set of parallel horizontal beams set from wall to wall to support the boards of a floor or a ceiling. The American Heritage Dictionary 690 (2nd College Edition 1982).

2. Although Olbrych did not explicitly clarify what this comment meant, we believe that this language denotes that Olbrych approved the unit for occupancy because Girouard subsequently moved into the premises. Additionally the rec-

ord reflects that Healy and another tenant moved into their units in August and September 1986. We note that certificates of occupancy must be issued by the city *before* the prospective owner or owners may move into the premises. *See generally* G.L.1956 (1989 Reenactment) § 23–27.3–120.1. We also note that "[n]o certificate of use and occupancy shall be issued prior to full compliance" with the state building code. *See* § 23–27.3–111.5.

stated that on the day he inspected Girouard's unit, he did not find any "serious" code violations.

Robert Hunt (Hunt), a state building official, did not agree with Olbrych's view of the premises or his understanding of the responsibilities of a municipal building inspector. Hunt testified that one of the responsibilities of a municipal building inspector is to issue building permits to ensure that the plans for construction meet the requirements of the state building code. If the inspector finds a violation of the state building code, Hunt explained, it is his or her responsibility to notify the building's owner of the violation. Hunt explained that an architect's stamp signifies that an architect is duly qualified and licensed to make architectural drawings. Hunt explained that a building inspector does not rely on the stamp "for anything."

As a result of a complaint filed by Quality with the Attorney General's office, Hunt made an inspection of the condominiums in July 1987. He testified that he made his inspection along with a representative from the Attorney General's office, a representative of the city building inspector's office, the city's director of public works, and several of the unit owners. He testified that he inspected about six to eight units. He stated that he found at least seven separate building-code violations that were common to all the units that he inspected. He found that the building was constructed too low in the ground, that the floor framing was overstressed, and that although the maximum stress level of the floor joists was fourteen feet, the joists were overstressed to seventeen feet. He also testified that he found other violations that were unique to specific units. By letter, Hunt notified the Attorney General's office and the city of the building-code violations.

Subsequent to Hunt's inspection another meeting was arranged with the Attorney General's office, the builder of the condominiums, the architect, and Olbrych. The purpose of the meeting was to discuss and attempt to rectify the code violations that Hunt had uncovered. Olbrych stated that the architect was to "draw up corrective action * * * to remedy the situation." He testified that he returned to the condominiums "on several occasions" to view the proposed repair work. He stated that he informed his supervisor in December 1987 that all the units were in compliance with the building code.

Olbrych further testified that he had inspected all the units with respect to each violation identified by the state building inspector. Quality believed that this testimony differed from a statement that Olbrych had made during the court-annexed arbitration hearing. Quality was permitted to call the arbitrator to testify regarding Olbrych's arbitration testimony. The arbitrator testified that, during the arbitration hearings, Olbrych stated that he checked some of, but not all the units for compliance with the building code.

Olbrych also testified that as a proposed solution to the floor-joist violation noted by Hunt, two lolly columns had been installed in all the units to support the overstressed floor joists. The architect contradicted this testimony by stating that lolly columns were not installed in all the units. Quality's expert witness in construction also testified that he visited the condominiums in January 1991 and found that the floor joists were still not properly supported and that lolly columns had not been installed in all the units. Additionally he noted that the problem with the sagging floors remained. Girouard stated that he never saw Olbrych return to his unit to inspect the floor joists.

The city contends that the trial justice erred by (1) denying the motion for a directed verdict and instructing the jury that the city could be held liable for the negligence of its building inspector and (2) permitting the arbitrator to testify at trial to statements made by a witness during an arbitration hearing.

It is well settled that in reviewing the propriety of a trial justice's decision to grant or to deny a motion for a directed verdict, this court is bound by the same standard as the trial justice. *Marcotte v. Harrison,* 443 A.2d 1225 (R.I.1982). This court views all the evidence in the light most favorable to the adverse parties, draws all reasonable in-

ferences therefrom, and refrains from weighing the evidence and passing upon the credibility of the witnesses. *Palmisciano v. Burrillville Racing Association,* 603 A.2d 317 (R.I.1992). If there exist issues upon which reasonable persons could draw different conclusions, the motion for a directed verdict should be denied. *Id.* at 320.

According to the public-duty doctrine, Rhode Island government entities enjoy immunity from tort liability arising out of their discretionary governmental actions that by their nature are not ordinarily performed by private persons. *Haley v. Town of Lincoln,* 611 A.2d 845, 849 (R.I.1992). The rationale behind the public-duty doctrine is "to encourage the effective administration of governmental operations by removing the threat of potential litigation." *Catone v. Medberry,* 555 A.2d 328, 333 (R.I.1989). This court has, however, established definite limitations on the immunity of government. *See generally Verity v. Danti,* 585 A.2d 65 (R.I. 1991). "We have determined that state liability will not attach absent proof that a special duty is owed to the plaintiff as an individual rather than as a member of the general public." *Id.* at 66. In cases in which this court has acknowledged the existence of a special duty, the plaintiffs have had some form of prior contact with state or municipal officials "who then knowingly embarked on a course of conduct that endangered the plaintiffs, or they have otherwise specifically come within the knowledge of the officials so that the injury to that particularly identified plaintiff can be or should have been foreseen." *Knudsen v. Hall,* 490 A.2d 976, 978 (R.I.1985).

A further erosion of the government's immunity occurs when the state or the municipality embarks on a course of action that is "egregious." *See Verity,* 585 A.2d at 67. "[T]he state is not immune from liability *even though no special duty has been shown* 'when the state has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation.'" (Emphasis added.) *Haley,* 611 A.2d at 849.

At the outset we note that the activities and the inspections that are required to ensure compliance with the state building code cannot be engaged in by private enterprise. Consequently, the action we review falls within the ambit of conduct covered by the public-duty doctrine. *See generally O'Brien v. State,* 555 A.2d 334, 336–37 (R.I. 1989). The city cites *Lakeside Condominium "C" Association v. Frediani Developers Inc.,* 135 Ill.App.3d 972, 90 Ill.Dec. 686, 482 N.E.2d 665 (1985), for the premise that the issuance of building permits and building inspections are devices utilized by municipalities to ensure that construction within its limits meets certain standards established to protect the public. Consequently, the city avers, the permits and the inspections are not insurance policies wherein the municipality guarantees that each building is in compliance with the code. The city avers that it cannot be held liable for each item of defective construction at a specific location. Absent a special duty or egregious conduct we agree with the city's position; however, we are not persuaded by the facts of *Lakeside.*

The record reflects that Olbrych met with Girouard, and Girouard specifically identified problems with his unit. Olbrych thus had specific knowledge of certain irregularities with respect to Girouard's unit. We emphasize that a single inspection of a premises by a building inspector would not support the requirements for the creation of a special duty on behalf of the city. However, the record reflects additional factors that created a special duty.

Hunt testified that a representative of the city's building inspector's office was present at the site when he made his inspections and noted the violations. Olbrych testified that he was present at the meeting with a representative of the Attorney General's office to discuss alternatives in remedying the problems with the condominiums. The architect testified that he met with the seller of the condominiums, the "[b]uilding [i]nspector for the [c]ity," and several of the unit owners to resolve the problems. Additionally the city received written notice from Hunt of the specific building-code violations observed and recorded in his July 1987 inspection. Ol-

brych specifically testified that he returned to the condominiums on "several occasions" to view the repair work. Subsequently, in December 1987, he wrote a memo to his superior informing him that all the units were in compliance with the building code. This second assertion of compliance was contradicted at trial by several witnesses.

This court is persuaded that the specific events listed above brought the individual unit owners " 'specifically into the realm of [the city's] knowledge.' " *Barratt v. Burlingham*, 492 A.2d 1219, 1223 (R.I.1985) (Kelleher, J., concurring). This was not an instance in which the potential "victim" was unknown to the city. *See generally Orzechowski v. State*, 485 A.2d 545 (R.I.1984). After the meeting with a representative of the Attorney General's office the city's duty was to the individual owners of the condominium's units and "not to some amorphous, unknown 'public.' " *Barratt*, 492 A.2d at 1223. Olbrych had continued contact with Quality during 1987. Olbrych clearly appreciated the seriousness of the violations since he returned on a number of occasions to ensure that the proposed corrective measures were taken. The city was acutely aware of a threat to the specific plaintiffs and in fact took some action to ensure remedy of the code violations. The city " 'knew or reasonably should have known of a threat to the specific plaintiff[s].' " *Id.* Consequently the city owed Quality a special duty.

■ We emphasize that a building inspector's visiting a site to ensure compliance with a building code would not be sufficient to establish a special duty. A municipality should not be the general insurer of every construction project within its limits. *See generally Lakeside*, 135 Ill.App.3d at 974, 90 Ill.Dec. at 687, 482 N.E.2d at 666. If it were, the resulting exposure to liability would be insurmountable and would dissuade municipalities from enacting or enforcing building codes. As a general rule building codes or ordinances impose an obligation on behalf of the municipality to the public at large. *Id.; see also Zimbelman v. Chaussee Corp.*, 55 Wash.App. 278, 281, 777 P.2d 32, 34 (1989). However, in this instance the actions of the city brought Quality into the realm of its

specific knowledge and thereby created a special duty. Consequently, because we find that a special duty existed, the trial justice did not err in denying the city's motion for a directed verdict. We believe that the record reflects issues upon which reasonable minds could differ regarding whether the city, through Olbrych, acted negligently in enforcing the state building code and breached a special duty it owed to Quality. Because we find that a special duty existed, we need not analyze the facts of this case under the egregious-conduct exception to the public-duty doctrine.

■ The city next contends that the trial justice erred by allowing the arbitrator from the court-annexed arbitration hearing to testify at trial. Quality contends that the testimony of the arbitrator did not offend the rules of arbitration. We note that since the date of trial the arbitration rules under review have been renumbered. In our analysis we refer to the current rule number.

Whether an arbitrator from the court-annexed arbitration program may testify at a subsequent trial regarding testimony at the arbitration hearing is an issue of first impression for this court. Rule 5(f) of the Superior Court Rules Governing Arbitration of Civil Actions states:

"*Arbitrator Not to be Called as Witness.* An arbitrator *may not* be deposed *or called as a witness* to testify concerning anything said or done in an arbitration proceeding. The notes of the arbitrator are privileged and not subject to discovery." (Emphasis added.)

Quality argues that the language of the rule allows the trial justice to exercise discretion in deciding whether to allow an arbitrator to testify. Quality contends that the use of the word "may" rather than the word "shall" indicates a discretionary rather than a mandatory provision.

■ Initially we note that Quality is correct in stating the general rule of statutory construction regarding the words "may" and "shall." *See generally Carlson v. McLyman*, 77 R.I. 177, 74 A.2d 853 (1950). However, when statutes use negative terms, they are usually interpreted as mandatory prohibi-

tions. *See generally Cabana v. Littler,* 612 A.2d 678, 683 (R.I.1992). "Negative words in a grant of power should never be construed as directory, and where an affirmative direction is followed by a negative or limiting provision, the affirmative direction becomes mandatory." *Id.* Consequently, not only is Quality's statutory-construction argument unpersuasive but an application of the *Cabana* dicta also supports the city's position that the trial justice erred.

Although our statutory-construction analysis is persuasive, we must answer this question while viewing the rules in their totality. The arbitration program was instituted to "reduce the costs of litigation and resolve cases assigned to the program more efficiently and timely." Arbitrator's Manual, Superior Court of Rhode Island at 5 (Rhode Island Law Institute). The rules were promulgated to govern the operations of the program and to aid in furthering its purpose. We note that "[t]he real significance of the arbitration process will lie in its effect on the *settlement process.*" (Emphasis added.) *Id.* at 58.

The trial justice allowed the arbitrator to testify because he determined that the jury's evaluation of Olbrych's truthfulness outweighed any concern regarding the witness' role as the arbitrator. Although the trial justice's motives were valid and he efficiently analyzed the competing concerns, we believe that a plain reading of the rules governing court-annexed arbitration dictates that the arbitrator should not have been allowed to testify.

We believe that a plain reading of the rules does not allow an arbitrator from the court-annexed arbitration program to testify at trial. Rule 5(d) of the Superior Court Rules Governing Arbitration of Civil Actions states that "[a] trial shall be conducted as if there had been no arbitration proceeding." The rule also states that no reference should be made to the arbitration proceedings without the consent of all parties to the arbitration and/or the approval of the court. Rule 5(e) precludes any evidence that there has been an arbitration hearing from being admitted at trial without the consent of all the parties to the arbitration and/or the approval of the

court. In contrast Rule 5(f) does not contain the "consent" or "approval of the court" language that subsections (d) and (e) of Rule 5 contain. Consequently although Rule 5 subsections (d) and (e) allow references to be made and evidence to be admitted from an arbitration proceeding with the consent of the parties and/or approval from the court, Rule 5(f) does not. Thus whereas Rule 5 subsections (d) and (e) allow for judicial discretion and/or agreement among the parties, Rule 5(f) does not.

■ An analysis of the plain language of Rule 5(f), when viewed in the context of the arbitration rules in their entirety and in the context of the general "settlement encouragement" purpose of the court-annexed arbitration program, leads this court to the conclusion that the exclusion of an arbitrator witness at trial is mandatory. *See generally* Arbitrator's Manual, Superior Court at 58. We believe that this interpretation of the rule is compatible with the commonsense definition of the term "may not." Additionally this interpretation supports our *Cabana* analysis. We note, however, that this interpretation does not require the exclusion of evidence otherwise discoverable merely because it is presented in the arbitration process. *See generally* Rule 3.1 of the Indiana Rules for Alternative Dispute Resolution and Rule 170–A–(j)–(2) of the Superior Court Rules of New Hampshire. Consequently we hold that the trial justice erred in allowing the arbitrator to testify at the subsequent trial.

Consequently the defendant's appeal is granted in part and denied in part. The papers in the case may be remanded to the Superior Court with directions that the defendant be given a new trial.

LEDERBERG J., did not participate.