DECISION
This case was tried by the Court without intervention of a jury on October 1 and October 2, 2001.
 FACTS
This cause of action arose when the plaintiff, Michael Brady, then Chief of Police of the Town of Charlestown, Rhode Island, slipped and fell outside the State House on Smith Street in Providence on March 11, 1997.
The plaintiff testified that on the day of the incident he was attending a 10:00 A.M. press conference at the State House at the invitation of the State Attorney General. He attended the conference in his capacity as Chief of Police of the Town of Charlestown, Rhode Island.
The plaintiff testified that it had snowed the night before the meeting to a depth of 2-4 inches. He testified that he arrived at the State House between 9:40 and 9:45 A.M., that the weather was cold and clear, that snow was visible and remained so on the streets and State House environs. The plaintiff noted the temperature was 26-27°F when he got up earlier that morning, but did not know the temperature at the time of the incident.
The plaintiff testified that he parked his car on Smith Street and walked into the State House via the left side of the cobblestone roadway to the front door of the State House. As he made his way to the front door, he observed snow pushed off to the side of the plaza, so-called, in front of the State House, stretching west to Smith Street.
The plaintiff testified he was at the press conference for approximately one hour and left the building at 10:45 a.m.-10:50 a.m.
Coming out of the Smith Street side door (the same door he went in), he observed the Governor's vehicle parked right at the door on the cobblestone roadway to the plaintiff's right as he exited the door.
The plaintiff stated he could see the red brick and the white marble from which the plaza was constructed as he approached the steps to the plaza. He observed that the area was clear of snow. He testified that the marble and brick surface appeared clear of ice and snow.
The plaintiff descended the marble steps on the State House to the plaza without incident. The plaintiff testified that he was wearing his black dress shoes with leather soles, that he was not in a hurry to make his next appointment, and that at no time did he observe any cones, signs or other warnings of slippery or hazardous conditions. He took two steps onto the brick and marble plaza area. On the second step, the plaintiff testified he slipped and fell on the ice on his second step. He testified that he landed on his left knee and then his right shoulder and right elbow.
As he lay on the ground, the plaintiff noticed ice and water adhering to his clothes. He testified he noticed no other substance. As he struggled to his feet, the plaintiff observed a sheen of ice on the marble and brick surface which he hadn't seen prior to the fall because it had frozen clear and was not visible to the plaintiff.
The plaintiff testified he was in great pain immediately, he made his way to his car, turned the car on and started driving to South County Hospital. The plaintiff testified that he called his secretary at the police station to tell her of his predicament. Within five (5) minutes of that call, the plaintiff's wife, a physician herself, was on the phone to the plaintiff. She urged the plaintiff to consider going to R.I. Hospital which was closer. However, the plaintiff was determined to press on to South County Hospital.
At South County Hospital, he was seen by an ER physician, x-rays were taken of plaintiff and a sling provided, because of a fracture sustained by the plaintiff, surgery was scheduled for the plaintiff with Dr. Marchand on March 13, 1997. The plaintiff was prescribed percocet and vicodan, and released to his home. At home, the plaintiff testified that he spoke to Sean P. Feeney, Esquire, and told Mr. Feeney what had happened.
The plaintiff testified that he sat on his couch all day and took pain pills as prescribed on March 11 and March 12, 1997. The surgery was performed on plaintiff's right arm on March 13, 1997 by Dr. Marchand and resulted in the repair of a fracture of plaintiff's right radial head itself and the installation of six (6) screws and a piece of metal to hold the radial head in place. The plaintiff was released to home on the same day. On the day following the surgery, the plaintiff went on errands and dinner in the evening, with his arm in a cast with a sling. The plaintiff testified that he went back to work for the Charlestown Police Department on the Monday following his surgery and underwent physical therapy two or three weeks after that.
The plaintiff testified as to his course of treatment with the physical therapist and explained the various exercises that were prescribed to the plaintiff in his rehabilitation. The physical therapy continued into June of 1997.
During this period the plaintiff testified he was restricted to administrative duties as Chief of Police and could not engage in his usual patrol duties as was his custom as chief of a small department.
On cross examination, the plaintiff testified that he walked into the State House to attend the press conference and no one in his observation fell on the plaza as he made his way into the State House. The plaintiff also testified that upon leaving the State House he had to attend a meeting at the Warwick Police Department scheduled for 11:00 A.M. He testified that he was not rushing to make that meeting as he exited the State House.
He testified that instead of going around the Governor's vehicle, he went to go straight out across the plaza noting the presence of snow pushed off to the left and right of the plaza. The plaintiff testified that he traversed the stairs from the State House leading to the plaza without incident and recalled seeing no other pedestrians falling or experiencing any difficulty in that general area. In fact, the plaintiff testified he could recall no other pedestrians in the general area of the incident at the time preceding his fall.
The plaintiff testified that he at no time notified any personnel at the State House that he had fallen and been injured either while at that location or at any other time until formal notice was sent to the State by his attorney. He testified that after he called his secretary, his wife called on his cell phone to advise him to go to Rhode Island Hospital because she, being a physician herself, thought the plaintiff to be in shock.
The plaintiff declined Rhode Island Hospital and joked with his wife in telling her that if anything happened to him before he reached the South County Hospital that he fell at the State House.
The plaintiff testified as to his course of treatment and surgery. He testified that he did not lose wages as Charlestown Police Chief and that after undergoing physical therapy, he was discharged from that activity with the admonition to "do what you can do" in regard to his physical activity.
He testified he still has the screws in his elbow, having elected not to have them removed. He testified that he had to relinquish his position as Chief because he could not resume full time patrol activities required of a chief of police in a small rural department. He acknowledged receiving a $36,000.00 annual tax-free disability benefit, with no medical coverage.
He testified that the disability received was two-thirds (2/3) of his regular salary as Chief of Police. He also testified that a state physician advised him he could no longer use his weapon as a police officer because of his disability. In 1998, he did qualify on a combat firing course and has been issued a private permit to carry a weapon.
The plaintiff testified that he attended and graduated law school and took the bar exam in February of 1997 and February of 1998.
The plaintiff retired from the police department on July 14, 1998. He was admitted to the Rhode Island and Connecticut Bars in 1999.
The plaintiff also testified regarding his part-time activities as a teacher at Johnson and Wales University, his coaching of track for Toll Gate High School, and his part-time association with the law firm of Hamel, Waxler, Allen Collins.
He testified that the accident did not interfere with his ability to pursue those part time jobs and that as of the time of trial, he was full time at the law firm and teaching at Salve Regina. The Court heard testimony from Sam DeVincenzo who has been the building superintendent for the State House for the last 15 years. He believes he was present on the day of the incident in 1997. He testified that he had four janitors under his direction at that time. He testified that snow is removed when it becomes necessary reaching a depth of 2 or 4 inches. The snow is removed by snow blower or shovel. The witness testified that his men are very experienced in snow removal, that the same procedure is followed routinely and that the entire plaza, so called, is cleared of snow with snow piled upon either side of the cleared walkway.
Mr. DeVincenzo testified that he checked the plaza area on the day of the incident. He can't specifically recall that day, but he testified that his routine is always the same. He testified that he arrives at the State House at 7:00 A.M. each morning and makes his "rounds". He testified that he follows this routine every day regardless of whether or not there is snow or inclement weather. He testified he walks the entire perimeter of the State House, walks throughout the corridors of the entire building and goes out on the balconies.
When shown plaintiff's Exhibit 1, a picture of the plaza, the witness acknowledged he was familiar with the area and that the snow removal depicted in the exhibit was satisfactory to him. He testified that he has "slippery when wet" signs for indoor display when needed and orange cones for use outside to denote dangerous areas.
Mr. DeVincenzo testified that he puts down a mixture of salt and sand to help combat slippery conditions on the wet marble. He acknowledged that wet marble is slippery and that if in fact there was no mixture of sand and salt applied on March 11, 1997, that that would be a violation of his procedures.
He also testified that no official log books were kept to record whether or not sand and salt was applied and he recalled no complaint ever being made to him or members of his department, or to the Capitol Police regarding unsafe conditions either on March 11, 1997, or any other time.
He testified that in addition to his early morning inspection he checked the premises, including the plaza, on an hourly basis particularly during inclement weather.
On cross-examination, he was unable to recall any incident of slip and fall at the State House in his 15 years there.
He also testified that the mixture applied to the marble surface to deal with the ice and snow is a substance call Urea. This is a white pellet-like substance which melts on contact and is spread by hand by his four-man crew.
He testified that the State House is a very busy building holding hundreds of state employees.
The General Assembly is in session between January and June and this activity generates many visitors on a daily basis.
He testified that while the sand which is applied to provide traction is tan in color, he observed no sand in the pictures shown him by the plaintiff. He also opined that sand would not necessarily be seen in a photo. He concluded his testimony by stating he had no idea that the plaintiff had fallen on the morning in question because no report was made to his department by the plaintiff.
The plaintiff presented Michael Brugnoli, a 20-year veteran of the Providence Police Department who is now general manager of the R.I. Bureau of Investigation and a licensed private eye.
He testified how he came to be involved in the investigation of this case and how he took the pictures offered in evidence. He testified he saw no sand or salt on the stairs or plaza at the State
House. He testified that he made his report to Attorney Feeney on March 17, 1997.
 PUBLIC DUTY DOCTRINE
Under the doctrine of sovereign immunity, "individuals who were tortuously injured by an agent of the state or by one of its political bodies were barred from recovery absent express statutory consent or a constitutional waiver of immunity." Resmini, Tort Law and Personal InjuryPractice, § 226 at 24 (1999). However, this doctrine has been abrogated by both the court and the legislature. See Becker v. Beaudoin,106 R.I. 562, 571, 261 A.2d 896, 901 (1970) and R.I.G.L. 1956 §§9-31-1[1] and 9-31-2.[2] Thus, the Government Tort Liability Act allows individuals to sue governmental units in the same manner as individuals for injuries sustained due to the negligence of state or local employees. However, the Act limits the damages recoverable against the state to $100,000 if the state is acting in a proprietary capacity. Despite these legislative pronouncements, the state and its political subsidiaries are not automatically liable for all negligence claims. Instead, "[t]he public duty doctrine[3] shields the state and its political subdivisions from tort liability arising [only] out of discretionary governmental actions that by their nature are not ordinarily performed by private persons." Haley v. Town of Lincoln,611 A.2d 845, 849 (R.I. 1992).
The court "refined the parameters of the public duty doctrine and mitigated its harsh effect" in Catone v. Medberry 555 A.2d 328 (R.I. 1989) and O'Brien v. State, 555 A.2d 334 (R.I. 1989). Resmini, Tort Lawand Personal Injury Practice, § 229 at 258 (1999). In these decision, the court abandoned the "Byzantine distinctions between governmental and proprietary functions. That distinction arose out of a common-law doctrine under which municipal corporations were liable in tort for activities performed in their proprietary capacities but not for activities defined as governmental functions." O'Brien v. State,555 A.2d 334, 338 (R.I. 1989). (Citations omitted.) Instead, the court wrote:
 "[w]hen we analyze whether an activity would be performed by a private person so as to bring it within the provisions of § 9-31-1, our analysis is functional rather than abstract. We inquire whether this is an activity that a private person or corporation would be likely to carry out. If the answer is affirmative, then liability will attach. Although this analysis may bear some analogy to the governmental-function test, it is far simpler and less complex in implementation." Id.
Since deciding these seminal cases, the court has had occasion to delineate what types of activities, in which the state or one of its subsidiaries is engaged, are subject to the limitations imposed by R.I.G.L. 1956 §§ 9-31-1 and 9-31-2. These cases are instructive in deciding whether the activity involved in the case at bar, the operation and maintenance of the plaza or walkway area of the State House, is one that would normally be performed by private individuals.
In the following cases, the court held that the activity involved constituted a governmental function, that is an activity in which a private person does not normally engage. See Kuhl v. Perrin, 706 A.2d 1328, 1329 (R.I. 1998) ("[O]peration and maintenance of a public school is a governmental function and not a proprietary one."); Matarese v. Dunham,689 A.2d 1057, 1058 (R.I. 1997) ("[M]aintenance of government buildings is plainly a governmental function."); L.A. Ray Realty, et al. v. Town ofCumberland, 698 A.2d 202, 208 (R.I. 1997) ("[W]e have no doubt that the adoption and application of a zoning ordinance is a governmental function."); Chakuroff v. Boyle, 667 A.2d 1256, 1258 (R.I. 1995) ("[T]he operation and the maintenance of a public school is a governmental function not a proprietary one."); Quality Condominium Assoc. v. QualityHill Development Corp., 641 A.2d 746, 750 (R.I. 1994) ([At] the outset we note that the activities and the inspections that are required to ensure compliance with the state building code cannot be engaged in by private enterprise."); Custom Flight Systems of New England, Inc. v. State, 641, A.2d 1324, (R.I. 1994) ("[R]unning a public airport is exclusively an activity performed by a public entity."); Longtin v. D'Ambra ConstructionCo., 588 A.2d 1044, 1045-46 (R.I. 1991) ("[I]t cannot be disputed that the reconstruction of Mendon Road, a state highway, is an activity that is performed exclusively by the state."); Polaski v. O'Reilly,559 A.2d 646, 647 (R.I. 1989) ("[I]n placing or failing to place or maintain a traffic-control sign, the city of Warwick was acting in an area in which no private person could intrude.").
In several other cases, the court has also found that the activity in which the state was engaged constituted a "proprietary function," that is activity that can be performed by a private individual or corporation.See Housing Authority of the City of Providence v. Oropeza, 713 A.2d 1262, 1264 (R.I. 1998) ("[T]he function at issue here, namely, the providing of security within and by the housing authority is proprietary in nature."); DeLong v. Prudential Property and Casualty Insurance Co.,583 A.2d 75, 76 (R.I. 1990) ("[T]he operation of a beach is a function that many private persons or corporations have carried out in this state."); Rhode Island Student Loan Authority v. NELS, Inc., 550 A.2d 624, 627 (R.I. 1988) ("NELS's essential function was to collect the principal and interest on outstanding student loans and to maintain records on all transactions. These functions are proprietary in nature.") (Citations omitted.); Lepore v. Rhode Island Public Transit Authority,524 A.2d 574, 575 (R.I. 1987) ("[W]e do not believe that maintaining a public-transportation authority is a function that is so intertwined with governing that we will consider it a governmental function. Rather, we shall consider its operation proprietary in nature.").
In the instant case, plaintiff maintains that the activity of snow and ice removal is "an activity that a private person or corporation would be likely to carry out." DeLong v. Prudential Property and Casualty Ins.Co., 583 A.2d 75, 76 (R.I. 1990). Plaintiff relies heavily on O'Brien v.State, 555 A.2d 334, 338 (R.I. 1989), wherein the court noted:
 "The state as a landowner . . . performs the identical function that a private person might perform or which a private person might well parallel, and therefore, the duties of the state as landowner or owner or operator of motor vehicles should be the same as that of any private person or corporation as the Legislature has ordained in § 9-31-1."
Plaintiff contends that as landowner the state had a duty, similar to that of a private individual, to maintain the premises in a reasonably safe condition for the benefit of those who come upon the premises. Since the defendant failed to remove the snow and ice from the plaza at the State House, plaintiff asserts that the defendant breached its duty and cannot cloak itself in the protection of the public duty doctrine. The activity involved in the case at bar is a proprietary function and plaintiff is not subject to the $100,000 limitation on damages set forth in R.I.G.L. 1956 § 9-31-2.
It cannot be disputed that snow and ice removal is an activity in which private persons and corporations are typically engaged. However, if a more expansive view of the activity involved is taken, such that plaintiff's complaint is based not on inadequate snow and ice removal but rather on the improper maintenance of a government building, then plaintiff's argument fails. This is precisely the analysis undertaken by the court inMatarese v. Dunham, 689 A.2d 1057 (R.I. 1997), wherein the court stated that "[m]aintenance of government buildings is plainly a governmental function." Id. Matarese involved a plaintiff who was injured by a City of Providence employee who was operating a motor vehicle owned by the City.Id. Rather than focusing on the City employee's action of driving the vehicle, the court concentrated on the fact that the employee was on twenty-four hour call to maintain government buildings. By adopting this broader perspective, the court held that the employee was performing a government function when he was operating the vehicle. Id. In the case at bar, the activity involved is the state's failure to properly maintain the plaza area of the State House, as evidenced by its inadequate removal of ice and snow, which is not normally an activity that private persons or corporations perform. As evidenced by the cases mentioned previously, the court has on numerous occasions held that the maintenance of different types of government property involves a governmental function rather than a proprietary one. See Huhl v. Perrin, 706 A.2d 1328 (R.I. 1998) (school); Chakuroff v. Boyle, 667 A.2d 1256 (R.I. 1995) (school);Custom Flight Systems of New England, Inc. v. State, 641 A.2d 1324 (R.I. 1994) (airport); Saunders v. State, 446 A.2d 748, 751 (R.I. 1982) (correctional institution).
Since the activity involved, in the instant case, the maintenance of the Rhode Island State House is a governmental function, the defendant is accorded the protection of the public duty doctrine. Accordingly, plaintiff's recovery in this case will be subject to the monetary limitations imposed by R.I.G.L. § 9-31-2.
 SPECIAL DUTY EXCEPTION AND EGREGIOUS CONDUCT EXCEPTION
In the event this Court deems the public duty doctrine applicable to the instant case, the plaintiff argues, in the alternative, that he should be permitted unlimited recovery against the state because he falls within one of the recognized exceptions to the public duty doctrine. There are three exceptions to the public duty doctrine; actions normally performed by private individuals, the special duty doctrine, and egregious conduct. The two latter exceptions are entertained only after the court decides that the activity engaged in by the state or its subsidiaries is one that is not ordinarily performed by a private person. Resmini, TortLaw and Personal Injury Practice, § 228 at 253 (1999).
As discussed above, since the operation and maintenance of the State House is not an activity that a private individual would typically perform, the plaintiff must fall within the parameters of one of the other exceptions to the public duty doctrine in order to maintain the present action. In order to fall within the special duty exception, the plaintiff would have to show that the state breached a duty of care owed to him as a specific, identifiable person. In Knudsen v. Hall, 490 A.2d 976, 978 (R.I. 1985), the court held that a special duty exists in those cases where:
 "Either the plaintiff have had prior contact with state or municipal officials who then knowingly embarked on a course of conduct that endangered the plaintiff, or they have otherwise specifically come within the knowledge of the officials so that the injury to that particularly identified plaintiff can be or should have been foreseen."
See also, Kashmanian v. Rongione, 712 A.2d 865, 867 (R.I. 1998); Kuzniarv. Keach, 709 A.2d 1050, 1054 (R.I. 1998); St. James Condominium Ass'nv. Lokey, 676 A.2d 1343, 1346 (R.I. 1996); Boland v. Town of Tiverton,670 A.2d 1245, 1248 (R.I. 1996). Similar to its examination of the public duty doctrine, the court has been presented with numerous opportunities to analyze whether a special duty existed between the plaintiff and the state in a variety of factual scenarios. See Schultz v. Foster-GlocesterRegional School District, 755 A.2d 153, 155 (R.I. 2000) (special duty exception applies and school district is liable to student plaintiff injured during cheering practice); Kashmanian v. Rongione, 712 A.2d 865, 868 (R.I. 1998) (since plaintiff homeowner did not come into realm of planning board's specific knowledge when water district's moratorium on subdivision development due to inadequate water supply ended, no special duty exists); Kuzniar v. Keach, 709 A.2d 1050, 1056 (R.I. 1998) (jury instruction permitting jury to decide if city official owed plaintiff a legal duty was improper); Boland v. Tiverton, 670 A.2d 1245, 1249 (R.I. 1996) (granting defendant's motion for summary judgment inappropriate since plaintiff should have been permitted to establish applicability of special duty and egregious conduct exception); Chakuroff v. Boyle,667 A.2d 1256, 1258 (R.I. 1995) (although plaintiff who complained to school about excessive wood dust levels in workshop was a specifically identifiable plaintiff, maintenance of school is a governmental function); Quality Condominium Asso. v. Quality Hill Development Corp.,641 A.2d 746, 751 (R.I. 1994) (special duty to plaintiff homeowners exists where city building inspectors were negligent in failing to inspect condominiums and in approving construction work that violated state building code requirements); Misurelli v. State Department ofTransportation, 590 A.2d 877, 878 (R.I. 1991) (department owed special duty to excavate, remove and replace sidewalk adjacent to plaintiff homeowner's property in a safe and reasonable manner; Longton v. D'AmbraConstruction Co., 588 A.2d 1044, 1046 (R.I. 1991) (special duty exists where plaintiff's property abutted state's construction project and plaintiff received assurances that defendants would fix any damage caused).
In the case at bar, plaintiff contends that in his capacity as Police Chief of the Town of Charlestown and as a member of the Rhode Island Police Chiefs' Association Legislative Committee, he was invited to the State House to attend a news conference. As such, plaintiff asserts that he was a specifically identifiable person within the meaning of the special duty exception. However, plaintiff argument fails because the duty to operate and maintain the State House is one that is owed to the public-at-large rather than to specific identifiable persons. Moreover, the plaintiff fails to set forth those factors that must be established in order to trigger the special duty doctrine as explicated by the court in Kuzniar v. Keach, 709 A.2d 1050, 1056 (R.I. 1998). The record does not indicate that (1) one or more city officials had prior contact or other knowledge about plaintiff or his situation before the alleged negligent act occurred, (2) a city official took any action toward plaintiff or failed to act in a manner that was potentially injurious to the plaintiff's person or property, and (3) the injury suffered by plaintiff was a reasonably foreseeable consequence of the city's action or inaction. Id.
In those cases where the court found the special duty exception applicable, there has been substantial contact between the state or its subsidiary and the plaintiff(s). For example, in Quality CondominiumAssoc. V. Quality Hill Development Corp., 641 A.2d 746 (R.I. 1994), the city building inspector met with plaintiffs and identified construction problems with the units, met with a representative from the Attorney General's office to discuss alternatives to remedy the construction problems, met with an architect and several condominium owners to resolve the problems and returned to the condominiums on several occasions to review the repair work. Id. at 750-51. These events brought the plaintiffs "specifically within the realm of the city's knowledge, thus establishing a special duty owed to the plaintiffs." Id. at 751. Another instructive case is Schultz v. Foster-Glocester Regional SchoolDistrict, 755 A.2d 153, 154 (R.I. 2000) involving a student who brought suit against the school district for injuries she sustained during cheerleading practice. The court stated:
 "It is clear that the school district was aware of Patricia, and knew of her cheerleading exploits. Patricia was both a student at the school and a member of the cheerleading squad. Further, the squad was composed of a small group of cheerleaders that had been practicing together for months; clearly the cheerleading coach knew of, and engaged in a relationship with, Patricia. Thus, we are satisfied that Patricia's injury was sufficiently foreseeable to trigger the special-duty doctrine and ultimately liability on the part of the school district." Id. at 156.
These two cases are indicative of the high standard that must be met in order to establish that a special duty exists between parties. In the instant case, the special duty to plaintiff is said to have arisen from the invitation extended by the Attorney General's office to the plaintiff to attend the press conference at the State House. However, such contact between the state and the plaintiff can be described as minimal at best. The invitation to attend did not bring the plaintiff within the realm of the state's knowledge within the meaning contemplated by the special duty exception. Thus, it is not the type of contact and curse of conduct that warrants application of the special duty exception to the public duty doctrine.
The last exception to the public duty doctrine is the egregious conduct exception which was first recognized by the court in Verity v. Danti,585 A.2d 65 (R.I. 1991), a case involving a thirteen year-old girl who suffered injuries when she was struck by an automobile after stepping off a sidewalk on to the road. She claimed that the defendant, the State Department of Transportation, failed to remove a large tree that covered the entire width of the sidewalk. Id. The court stated "[considering the facts presently before this court in light of the recognized volatility of the public duty doctrine and governmental immunity, we are of the opinion that the state's immunity should be further abrogated and plaintiff's claim should not be barred." Id. at 67. The court held that:
 "The state's negligence in this instance is so extreme that to bar suit under the public duty doctrine would effectively excuse governmental employees from remedying perilous situations that they themselves have created. To recognize governmental immunity under the present facts would violate the basic premise of the Tort Claims Act." Id.
Finally, the court wrote "when a state has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation, the public duty doctrine does not shield the state from liability." Id. The court has elaborated on the egregious conduct exception in subsequent cases. SeeKashmanian v. Rongione, 712 A.2d 865, 867 (R.I. 1998) (court outlines different elements that must be established for egregious conduct exception to apply); L.A. Ray Realty, et al. v. Town of Cumberland,698 A.2d 202, 208-09 (R.I. 1997) (town's adoption and enforcement of an invalid ordinance so as to interfere with plaintiffs' expectations regarding their property amounted to egregious misconduct); DeFusco v.Todesca Forte, Inc., 683 A.2d 363, 365 (R.I. 1996) (no egregious conduct because no evidence that state had constructive or actual knowledge of prior accidents or that state acted egregiously in opening ramp before construction was complete); Cornell v. Jan Co. Central, Inc.,671 A.2d 1223, 1225 (R.I. 1996) (no egregious conduct could be established by the placement of a functioning traffic signal on the sole ground that arrangements should have been made for a delayed light or a turning arrow); Houle v. Galloway School Lines, Inc. 643 A.2d 822, 827 (R.I. 1994) (directed verdict for defendants inappropriate where issue of whether egregious conduct exception applied should be submitted to jury); Catri v. Hopkins, 609 A.2d 966, 969 (R.I. 1992) (state's decision not to install a traffic light at an intersection, despite public demand, was not actionable or egregious conduct); Haley v. Town ofLincoln, 611 A.2d 845, 850 (R.I. 1992) (judgment on pleadings for defendant inappropriate where plaintiff could succeed under egregious conduct or special duty exception); Bierman v. Shookster, 590 A.2d 402, 404 (R.I. 1991) (failure to maintain the traffic light gave rise to liability under the egregious conduct exception).
In Verity v. Danti, 585 A.2d 65, 67 (R.I. 1991), the court created an exception to the public duty doctrine for those situations where "the state's negligence . . . is so extreme that to bar suit under the public duty doctrine would effectively excuse governmental employees from remedying perilous situations that they themselves have created." The actions of the state in the instant case, however, do not rise to the level of egregious conduct.
While the Court finds as a fact that the State of Rhode Island had actual or constructive notice of the need to be vigilant for the presence of ice or snow on the marble plaza (Kashmanian v. Rongione, 712 A.2d 865, 867 (R.I. 1998)), the Court does not find that factually, the condition complained of by the plaintiff is so egregious as to rise to the level necessary to qualify for this exception to the public duty doctrine. Therefore, since the defendant's action in the case at bar does not rise to the level of egregious conduct, the plaintiff cannot rely on this exception to the public duty doctrine.
Thus, plaintiff fails to establish that he would fall within one of the recognized exceptions to the public duty doctrine, that is either the special duty exception or the egregious conduct exception. Given that the operation and maintenance of the State House is a governmental function and none of the exceptions to the public duty doctrine apply, the plaintiff's recovery for his injuries should be limited to $100,000 under R.I.G.L. 1956 § 9-31-2.
 DAMAGES
The plaintiff presented Dr. Leonard Lardaro, Ph.D. who rendered his opinion on the economic loss sustained by the plaintiff as a result of his disability retirement as Chief of Police of the Town of Charlestown. He presented his testimony by calculating two scenarios. The first was a full career scenario which contemplated the plaintiff's full career and eventual retirement as Chief of Police of the Town of Charlestown. The plaintiff had testified that it was his intention, despite his law degree, teaching and coaching assignments, to complete his career as Chief of Police after 20 years of service.
The second scenario is based on a shortened career scenario which actually happened to the plaintiff and which calculates his economic loss resulting from his retirement on a disability pension on July 14, 1998.
In both scenarios the witness calculates wages and fringe benefits of the plaintiff and explores the disability pension scheme under which the plaintiff retired receiving 66 2/3% of the salary plaintiff was earning at the time. The witness discussed the penalty provision of the plaintiff's pension which requires a payback of one dollar for every dollar the plaintiff earns which is in excess of the salary of the current Chief of Police in Charlestown, whoever that may be. This payback penalty is a loss, dollar for dollar of tax free disability pension and results in the taxability of every dollar earned which occasioned the payback.
This penalty, the witness opined, is very severe because of the loss of tax free income under the pension and the taxability of non-pension dollars earned.
Figuring the present value of total income associated with the full career scenario, the witness placed the value at $1,686,169.00 for the plaintiff' work life expectancy.
The witness placed the present day value of the plaintiff's income under the shortened career scenario at $1,462,901.00 when legal earnings grow at a constant rate and $1,433.515.00 when legal earnings move to their full time level in 2001 and remain there through the end of the work life expectancy which would end in the year 2020.
When these scenarios are compared, the witness declared the plaintiff's economic loss to be either $223,208.00 with gradual legal earnings rise and $242,654.00 with a rapid legal earning rise.
The witness testified that according to his compilation of economic loss as contained in Exhibit 13B full in his report, and Exhibit 14 full, the United States Abridged Life Tables, 1996, shows the 43 year-old male plaintiff's life expectancy to be 33.7 years.
The plaintiff argues, by way of example, that if the current Chief of Police of Charlestown earns $60,000.00 per year and the plaintiff earns $80,000.00 from all sources, the plaintiff would therefore lose $20,000.00 from his $36,000.00 disability pension and in addition that the $20,000.00 loss would be taxed to the plaintiff because it is not disability income. The plaintiff argues that because the defendant stipulated to the admission of the economist's report as a full exhibit that the defendant also is estopped from challenging the content of the report.
The defendant argues that a stipulation to admit an exhibit does not automatically bind the stipulating party to its content, but only to the exhibit meeting the tests of admissibility. The Court finds as a fact that the opinion of the defense in this case is appropriate and the Court finds that the defendant agreed only to the admissibility of the report, not its content.
The defendant has argued that regardless of the lost overtime, of the disability pension of the plaintiff, that because of his success as a full time attorney and part-time coach and college instructor and his having to pay taxes on the earned income, that the plaintiff in a short period of time would be eclipsing the disability pension totally.
One aspect of the report of the plaintiff's expert's testimony is largely based on the plaintiff's stated desire to remain as Chief of Police for 20 years and retire on a full pension. The time frame to accomplish this feat would be 9 to 10 years of continued service by the plaintiff from the time of his accident. This assumption, while made in good faith by the plaintiff, appears to the Court and the Court finds as a fact to be too speculative in nature to be relied on by the expert when viewed in the light of the other evidence in this case relative to plaintiff's earning and earning capacity, his successful completion of law school and his subsequent admission to the Bars of Connecticut and Rhode Island.
The evidence shows that the plaintiff's outside income from the law and teaching and coaching was increasing at a fair rate. The plaintiff had testified that he received between $9,000.00 to $12,000.00 from Johnson and Wales University, and approximately $2,500.00 from Tollgate High School in Warwick, Rhode Island, and $43,150.00 from Salve Regina University in Newport, Rhode Island as a part-time professor, as well as his part-time law practice salary.
The defendant argues that the plaintiff would not have continued to desire to remain as chief as his ancillary income grew through his teaching and law related activities as a member of the Rhode Island and Connecticut Bars.
The law of damages in this case is to make the injured party whole not to place the plaintiff in a better position that the plaintiff was in at the time of the incident.
In this case there is clear evidence that the plaintiff's income was most probably going to increase and surpass the benefits derived from the disability pension, even with the paying of income tax on the money earned. While the disability pension is in effect and the plaintiff's wages are not triggering the payback provision, the disability pension is providing the protection it was designed to provide to the plaintiff.
When the plaintiff by his own diligence and through an increase in his education and experience is able to subsume the tax free disability pension, this is not a true loss to the plaintiff.
The plaintiff's expert testified that the work life expectancy of the plaintiff was 23.2 years ending in 2020. The Court finds that the expert's estimation of income generated by the practice of law over this period, both in the full career and shortened career scenarios, and his extrapolation of legal income growth on a rapid or gradual earning rise is based on speculation and not grounded on definitive economic principles identified to the Court as true indicators of attorney wage projections over time.
Accordingly, the Court finds as a matter of fact and as a conclusion of law that the plaintiff has failed to prove, by a fair preponderance of the credible evidence, that the plaintiff has or will suffer over time a measurable loss of income based on the experts' projections. Accordingly, the Court declines to award damages based on a loss of income to the plaintiff now or in the future.
 PLAINTIFF'S INJURY
The plaintiff has presented evidence that as a result of the fall he sustained a fracture of his elbow. Two days after the accident he underwent outpatient surgery to address the injury. The plaintiff returned to work four days later as Chief of Police of Charlestown. As part of the plaintiff's rehabilitation, he undertook physical therapy until June of 1997.
The plaintiff offered uncontroverted evidence to show, that as a result of the accident, the plaintiff sustained a permanent partial lifetime disability of 2% of his upper body and a 1% partial disability of his body as a whole. (See Exhibit 8, Dr. Robert Marchand and Exhibit 9, J. Dr. Russell Corcoran.)
This determination is based on the American Medical Association's Guide to the Evolution of Permanent Impairment 4th Ed., Exhibit 7.
Plaintiff's life expectancy according to the life tables introduced in evidence is 33 years. (Plaintiff's Exhibit 14.) In addition, the plaintiff has testified that he has suffered and continues to suffer pain in his elbow and that fact is also evidenced by the crepitus which exists in the elbow which continues to pain the plaintiff.
The plaintiff testified that since 1970, the plaintiff has been engaged in vigorous athletic pursuits. More recently, the plaintiff has engaged in the Senior Olympics in the Masters Division for the javelin throw for persons 40-45 years of age. He has received medals for this activity and he can no longer compete in this sport because of his surgery.
The plaintiff testified he engaged in golf, however, he did not play in 1997, 1998, or 1999. He was able to resume play, with pain and difficulty, in 2000. The plaintiff has been unable to do house and/or yard work since the accident.
The plaintiff testified that some activities he pursues on a daily basis causes pain and during the trial the plaintiff testified that his pain level is usually a 5 or 6 out of 10 — particularly upon twisting of his right elbow or moving his right arm.
Some activities which cause a painful reaction are writing, typing, cutting meat, twirling spaghetti or screwing in a light bulb. The plaintiff testified that he has crepitus in his right arm which is evident and painful on right arm rotation. (The Court was asked to palpate the area during trial and did feel and hear the right elbow crepitus.)
The plaintiff testified that he is now taking painkillers such as celebrex, maprosin or viox three or four times per week as needed to alleviate pain.
 CONCLUSION
The Court finds as a fact that the plaintiff was a credible witness in all respects. He offered uncontroverted evidence with regard to the factual situation surrounding his fall. The Court finds as a fact that the plaintiff was not negligent to any degree in contributing to cause his fall and subsequent injuries. He looked when looking was efficient and apprehended no danger due to the clear icy conditions, lack of sand or Urea or any warning device indicating a dangerous or hazardous condition. The plaintiff operated as a reasonably prudent person would have done under the same or similar circumstances.
The Court finds as a fact that the plaintiff has proved by a fair preponderance of the evidence that he incurred $8,794.64 in reasonable and necessary medical expenses as a result of the injury occasioned by the ordinary negligence of the defendant.
The Court in consideration of and in reliance upon the plaintiff's uncontradicted medical and personal testimony, the nature and extent of his injury, his medical course of treatment and the extent of the plaintiff's past, present and expectation of future pain and suffering in conjunction with the experienced limitations in lifestyle and physical activity, and in light of the assessment of the plaintiff's permanent, partial disability for the remainder of his life expectancy, hereby awards to the plaintiff, including all medical and other ancillary expenses, the sum of $90,000.00 for all damages sustained as a result of the plaintiff's fall on March 11, 1997, plus costs.
[1] R.I.G.L. 1956 § 9-31-1, provides: "[the] state of Rhode Island and any political subdivision thereof, including all cities and towns, shall . . . hereby be liable in all actions of tort in the same manner as a private individual or corporation."
[2] R.I.G.L. 1956 § 9-31-2 provides: "[i]n any tort action against the state of Rhode Island or any political subdivision thereof, any damage recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the state was engaged in a proprietary function in the commission of the tort, or in any situation whereby the state has agreed to indemnify the federal government or any agency thereof for any tort liability, the liability on damages set forth in this section shall not apply."
[3] The primary purpose of the doctrine "is to encourage the effective administration of governmental operations by removing the threat of potential litigation. This need to protect the government's ability to perform certain functions is particularly relevant when the activity in question involves a high degree of discretion such as governmental planning or political decision making. The state would be unable to function if liability was imposed each time an individual was deleteriously affected by such activities." Catone v. Medberry,555 A.2d 328, 331 (R.I. 1989).